Winston M. **REYNOLDS**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 15284.

United States Court of Appeals Fifth Circuit.

Aug. 23, 1955.

Rehearing Denied Sept. 29, 1955.

Zach H. Douglas, Jacksonville, Fla., Clyde W. Atkinson, Tallahassee, Fla., Charles R. Adams, Jr., Frank S. Twitty, Camilla, Ga., for appellant.

Harrold Carswell, U. S. Atty., Tallahassee, Fla., Hayford O. Enwall, Asst. U. S. Atty., Gainesville, Fla., for appellee.

Before RIVES and CAMERON, Circuit Judges, and DAWKINS, District Judge.

RIVES, Circuit Judge.

This appeal is from a judgment of conviction on five counts of a six count indictment,[1] each charging a gambling tax offense. The sentences on the several counts aggregated seven years imprisonment, $12,500.00 in fines, and the costs as prescribed therefor, and required to be paid by him on or before November 30, 1953, in accordance with the provisions of Section 3285 Internal Revenue Code of the United States."

The Fourth Count was identical with the Third Count, except that the time alleged was "during the month of November, 1953."

"Fifth Count.

"That heretofore, during the month of October, 1953, Winston M. Reynolds of Leon County, in the Northern District of Florida, and within the jurisdiction of this Court, then engaged in the business of conducting a lottery for profit, commonly known and called 'Numbers' or 'Cuba', and of accepting wagers, during which month he received in wagers in the conduct of such lottery and wagering business the sum of Sixty Five Thousand Nine Hundred Twenty Three Dollars ($65,923), did knowingly, willfully, and feloniously fail to truthfully account for the pay over unto the District Director of Internal Revenue, District of Florida, or his duly authorized representative, the excise tax on such wagers, in the sum of Six Thousand Five Hundred Ninety Two and 30/100 Dollars ($6,592.30), imposed thereupon, as prescribed therefor, and required to be truthfully accounted for and paid over as aforesaid, by him, on or before November 30, 1953, in accordance with the provisions of Section 3285 Internal Revenue Code of the United States and the regulations thereunder.

"Contrary to the form of the statutes in such case made and provided [26 U.S.C. §§ 3287 and 2707(c)] and against the peace and dignity of the United States of America."

The Sixth Count was identical with the Fifth Count, except that the time alleged was "during the month of November, 1953."

I.                    "First Count.

"That heretofore, on or about July 1, 1952, and continuously thereafter to and including June 30, 1953, Winston M. Reynolds of Leon County, in the Northern District of Florida, and within the jurisdiction of this Court, then engaged in the business of conducting a lottery for profit, commonly known and called 'Numbers' or 'Cuba', and of accepting wagers, did knowingly, willfully, and feloniously attempt to evade and defeat the payment of the wagering occupational tax prescribed for such business and required to be paid by him during and for such period aforesaid, in accordance with the provisions of Sections 3285 and 3290 of the Internal Revenue Code of the United States.

"Contrary to the form of the statute in such case made and provided [26 U.S.C. § 2707(c)] and against the peace and dignity of the United States of America."

The Second Count was identical with the First Count, except that the time alleged was "on or about July 1, 1953 and continuously thereafter to and including November 28, 1953."

"Third Count.

"That heretofore, during the month of October, 1953, Winston M. Reynolds of Leon County, in the Northern District of Florida, and within the jurisdiction of this Court, then engaged in the business of conducting a lottery for profit, commonly known and called 'Numbers' or 'Cuba', and of accepting wagers, during which month he received in wagers in the conduct of such lottery and wagering business the sum of Sixty Five Thousand Nine Hundred Twenty Three Dollars ($65,923), did knowingly, willfully, and feloniously attempt to evade and defeat the payment of the excise tax on such wagers in the sum of Six Thousand Five Hundred Ninety Two and 30/100 Dollars ($6,592.30) imposed thereupon,

of court. As shown in footnote 1, supra, the counts were in groups of two, according to the kinds of offenses charged; Counts 1 and 2, attempting to evade and defeat the payment of the wagering occupational tax, Counts 3 and 4, attempting to evade and defeat the payment of the excise tax on wagers, and Counts 5 and 6, failing truthfully to account for and pay the excise tax on wagers; and as to each offense it was charged that the same was knowingly, willfully and feloniously committed. By its verdict the jury found the defendant "guilty as charged in Counts 2, 3, 4, 5, 6 of the indictment."

The claimed errors relate to the following rulings of the district court: (1) denial of motion to dismiss indictment and each count thereof; (2) denial of motion for bill of particulars; (3) denial of motion to transfer case to Jacksonville Division of Southern District of Florida; (4) denial of motion for change of venue; (5) admitting telephone conversations in evidence; (6) admitting telephone toll tickets in evidence; (7) admitting photograph in evidence; (8) denial of motion for judgment of acquittal.

■■ (1) *Motion to Dismiss.* In appellant's original brief, the denial of the motion to dismiss was not specified as error but when the Government in its brief called attention to the recent decision of this Court in Clay v. United States, No. 15,060, 5 Cir., 218 F.2d 483, a supplemental brief on appellant's behalf was filed vigorously urging this point. The opinion in the Clay case, supra, does not show the exact terms of the indictment, and for convenience of reference we copy in the footnote the single count indictment in that case.[2] As will be observed, footnote 2, supra, that indictment alleged the *quo modo,* it charged the attempt to evade the occupational tax "*by* engaging in the business of accepting wagers * * * without having paid said occupational tax * * *." (Emphasis supplied.) On the other hand, the indictment in the present case (footnote 1, supra), pleads the offense substantially in the language of the statute, which is an approved mode of pleading with the single exception of an instance where the words of the statute do not contain all the essential elements of the offense.[3] That exception can have no application here unless it be held that Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418, added a substantive element to those contained in the statute defining a similar offense; and that is not true, for the Spies case simply construed the statutory language, "willfully attempts in any manner to evade or defeat any tax * * *." 26 U.S.C.A. § 145(b), I.R.C.1939. Indeed, in income tax cases, it has been stated that an indictment need not specify the means whereby the defendant attempted to evade and defeat the tax.[4] Information

2. "The Grand Jury Charges:
   "Count One.
   "That on or about the 8th day of July, 1953, in the Middle District of Georgia, Will Parks Clay, Walter Jolly, Andrew B. Turk and Andrew Morris, all of Macon, Georgia, did willfully and knowingly attempt to evade and defeat the wagering occupational taxes due and owing by each of them to the United States of America for the fiscal year ending June 30, 1954 by engaging in the business of accepting wagers, as defined in Section 3285 of the Internal Revenue Code, without having paid said occupational tax as required by Section 3290 of the Internal Revenue Code, in violation of Section 2707(c), Internal Rev-

enue Code, as made applicable by Section 3294(c), Internal Revenue Code."

3. Rule 7(c) Federal Rules of Criminal Procedure, 18 U.S.C.A.; United States v. Debrow, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92; Norris v. United States, 5 Cir., 152 F.2d 808; United States v. Williams, 5 Cir., 203 F.2d 572, 573.

4. Capone v. United States, 7 Cir., 56 F.2d 927, 932; United States v. Miro, 2d Cir., 60 F.2d 58, 60; United States v. Gorman, D.C.E.D.N.Y., 62 F.Supp. 347, 348; United States v. Bahcall, D.C. N.D.Ill., 116 F.Supp. 869; United States v. Trownsell, D.C.N.D.Ill., 117 F.Supp. 24, 25.

as to the particular means employed may be obtained by bill of particulars.[5] As will be later shown in discussing the appellant's third insistence on error, the grounds of the motion to dismiss based on objections to the venue were not well founded. There was, therefore, no error in denying the motion to dismiss the indictment.

(2) *Bill of Particulars.* Appellant next complains in brief of the denial of his "motion for a bill of particulars calling upon the Government to allege plainly and definitely what act or acts were done by him evidencing a wilful attempt to evade or defeat the tax." Actually, there was no such motion, but the particulars called for in the motion were simply:

"As to Counts Three and Five.

"1. How and in what manner the government arrived at the figure of $65,-923.00 set forth in each of said counts.

"As to Counts Four and Six.

"1. How and in what manner the government arrived at the figure of $43,-755.00 set forth in each of said counts."

The Government was not held to proof of the exact amounts alleged.[6] The motion for bill of particulars as filed was addressed to the sound discretion of the court,[7] and we cannot say that such discretion was abused in this case.

(3) *Motion to Transfer Case.* Appellant insists that he could have paid the occupational gambling tax and the excise taxes on wagering at but one place, the Collector's office in Jacksonville, Florida, and, hence, that the venue lay in the Jacksonville Division of the Southern District of Florida. This objection was raised also by motion to dismiss, which, we think, was the technically correct method, inasmuch as the case does not come within the rules providing for transfer.[8] In any event, there is no doubt that the objection to venue was duly presented by one method or the other. We think, however, that the venue was properly laid in the district wherein the crime was alleged to have been committed. See Sixth Amendment to the Constitution of the United States. Cf. Haas v. Henkel, 216 U.S. 462, 474, 30 S.Ct. 249, 54 L.Ed. 569. In Holbrook v. United States, 5 Cir., 216 F.2d 238, 239, it was alleged that the attempt to evade was " 'by filing and causing to be filed * * * a false and fraudulent income tax return' " and, hence, the case was properly triable in the Atlanta Division, where such return was filed, rather than in the Gainesville Division where the defendant resided. We agree with what was said by the Fourth Circuit in Beaty v. United States, 213 F.2d 712, 715:

"This contention, however, overlooks the fact that the defendant was not indicted for wilfully failing to make returns and pay the taxes in violation of Sec. 145(a), or for making returns which he did not believe to be true and correct as to every material matter, in violation of Section 145(c) of the statute, but for attempting to evade or defeat the payment of the taxes by maintaining false books and records, by concealing assets, and covering up sources of income, and by preparing and filing false and fraudulent income tax returns. It has been held in cases where the charge was confined to an attempt to evade the tax by filing a fraudulent return that the offense was committed where the returns were filed. See the conflicting decisions in United States v. Aaron, D.C.N.D.W.Va., 117 F. Supp. 952, and United States v. Albanese, D.C.S.D.N.Y., 117 F.Supp. 736. The charge in the case at bar, however, includes the making of false records and

---

5. Demetree v. United States, 5 Cir., 207 F.2d 892, 894.

6. Tinkoff v. United States, 7 Cir., 86 F.2d 868, 878.

7. Rule 7(f) Federal Rules of Criminal Procedure, 18 U.S.C.A.; Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; Johnson v. United States, 5 Cir., 207 F.2d 314.

8. Rules 19, 20, 21, Federal Rules of Criminal Procedure.

the concealment of assets, and if any of these acts are proved to have occurred in the Western District of North Carolina, the case is made out and the trial court had jurisdiction." See 348 U.S. 905, 75 S.Ct. 311, Id., 4 Cir., 220 F.2d 681.

In the case at bar no returns were filed nor taxes paid. Each count of the indictment specifically charged that the crime was committed in the Northern District of Florida, and, hence, the venue was properly laid in that district.

■■■ (4) *Motion for Change of Venue.* Proceeding under Rule 21(a) Federal Rules of Criminal Procedure, the defendant moved the court "for a change of venue to another division of this district" on the ground that the trial had been so highly publicized by the press and radio broadcasts that he could not obtain a fair and impartial trial in the Tallahassee Division. In support of that motion, the defendant presented Exhibit "A" consisting of a large file of newspaper clippings and Exhibit "B" consisting of a transcript of numerous radio broadcasts, and cited many authorities culminating with Shepherd v. State of Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740. The court denied the motion for change of venue.

The defendant was indicted February 4, 1954, and the trial at which he was convicted did not commence until September 13, 1954, more than nine months thereafter. Meanwhile, in the Florida State Courts he had been found not guilty of the offense of operating a lottery on March 14, 1954, and his first trial in the Federal Court had resulted in a mistrial on March 28, 1954. In the view of the district judge, the results of those two trials refuted the alleged grounds of prejudice.[9]

The appellant's counsel properly concede, "that much of the publicity which his case has received was a mere reporting of facts and not subject to censure." They complain particularly, however, of a news story in the Tallahassee Democrat of November 30, 1953, containing the headline, "Cuba Headquarters Uncovered." That was before either of the earlier trials and long prior to the trial at which the defendant was convicted. The date on which another article was published in the same paper headed, "Possible Leon—Phenix City Link Being Studied", does not appear either in the record or in the newspaper clipping.

Appellant bitterly complains that some of the publicity had insinuated that he was a member of a "crime ring" responsible for the death of Charlie McKinnon, a negro who had given statements to State and Federal officers against the defendant, and who was found dead in a ditch near his home in Pelham, Georgia, on January 10, 1954. A warrant charging defendant's employee, Al Tharpe, with the murder of McKinnon was issued, but on preliminary trial in the City Court of Camilla, Georgia, the judge ruled that "the State has failed to make a case for binding this defendant over to the grand jury," and discharged Tharpe. That was on May 8, 1954, more than four months before the trial at which defendant was convicted. McKinnon had been killed, as has been stated, on January 10, before the defendant's acquittal in the State Court, and before his first trial in Federal Court resulting in a mistrial; and most of the adverse publicity seeking to connect the defendant with his death was prior to either of said earlier trials. The discharge of defendant's employee, Tharpe, after those two trials might reasonably be

9. "The Court has given careful consideration to said motion, the argument of counsel in support thereof, the leading authorities relied upon and finds no merit therein. The record of the trial of defendant in the Circuit Court of Leon County, Florida and in his previous trial in this Court refute the alleged grounds of prejudice stated in said motion for a change of venue. In the opinion of this Court the opportunity for defendant to obtain a fair and impartial trial are (sic) as good, if not better, in the Tallahassee Division of this Court as in any other Division of the District."

expected to mitigate somewhat the effects of such adverse publicity, even though articles concerning "New Evidence" continued to be published as late as July 22, 1954.

The appellant complains further, that more bad publicity plagued him subsequent to his two earlier trials due to his trial and conviction for contempt of court in tampering with the jury on his trial for violation of the State lottery law. At the time of his sentence for contempt, he admitted talking to a member of the jury venire but denied any evil intent. The Florida Supreme Court refused to review his conviction, and he served sixty days for contempt of court, beginning the week of May 28, 1954, and concluding therefore over a month and a half before the trial in Federal Court at which he was convicted. That complaint reminds us of the old saw about the boy who slew his parents and then pleaded for mercy because he was an orphan. The defendant brought that bad publicity on himself.

Notwithstanding that fact, however, he was entitled to a fair trial, free from bias or prejudice, on the present indictment. In this connection, we observe that not a single witness testified that the defendant could not get such a trial in the court in which he was prosecuted. The record of the trial shows that the court instructed the jurors not to read newspapers nor to listen to radio broadcasts while the trial was in progress, but it does not disclose the questions asked the jurors on voir dire. One of the newspaper clippings, however, discloses that the court excused two of the panel members for cause when they admitted that recent publicity "had caused them to form opinions as to guilt or innocence." More important, the record does not disclose the places of residence of the jurors, nor in which divisions of the judicial district they resided. For aught that appears, the jurors were drawn from divisions other than the Tallahas-

see division of the court, where the prejudice was claimed to exist. The burden, of course, rests upon the appellant to show error in the court's ruling. Finally, we have carefully read and considered the voluminous exhibits of newspaper clippings and transcripts of radio broadcasts, and we cannot say that the district court abused its discretion in denying a change of venue. See Kersten v. United States, 10 Cir., 161 F.2d 337, 339.

(5)–(8). *Questions on Admissibility and Sufficiency of Evidence.* Expert testimony as to the operation in Florida of the illegal lottery,[10] commonly known as "Numbers", "Cuba" or "Cuba bolita", explained the use therein of various printed slips, of adding machines, shortwave radios, the types of telephone messages to be expected, and the usual times when such telephone communications would occur.

Since 1909 a legal national lottery has been operated by the Government of Cuba. Three winning numbers are announced by short-wave radio broadcast from Havana usually on each Saturday afternoon between the hours of 2:00 and 8:00. As "Cuba" is played in Florida, the "hit" or winning number is determined by the last two numbers or digits of the "primary" or grand prize number of the Cuban National lottery.

The bets are placed on numbers from 1 to 100. The winning number usually pays seventy times the amount bet. The seller has a small pad on which he records in duplicate the amount bet, the number on which the bet is placed and some symbol of identification, one copy being given to the player and the seller keeping the other copy. On Friday night or Saturday morning, the sales are "closed," the seller tallies up the money collected on each number on a "tally sheet" and the "pickup man" collects the "tally sheets" and money from the many sellers operating under him. He then compiles the information on a "master tally sheet" and reports to the "banker"

---

10. Unlawful in that State. Sections 849.-09–849.13 Florida Statutes, 1953, F.S.A.; Fraterrigo v. State, 151 Fla. 654, 10 So. 2d 304.

at least one or two hours before the "close out time." If a larger amount is bet on a given number than the banker can afford to lose or cares to risk, he usually has another and bigger banker to whom he can "lay off" the excessive amount. "Close out time" is normally about noon on Saturdays, or one or two hours before the time for announcement in Cuba of the winning number, long enough to enable the banker to make his computations and "lay offs" if necessary.

A pickup man reporting to his banker by telephone usually recites merely the figures or numbers representing the amount of money bet on each number from one to one hundred. The banker communicates with his "lay off" usually by phone; and, after getting the winning number over short-wave radio, the banker communicates that to his pickup men, who in turn communicate it to their sellers.

The pickup man often pays off the winner, if any among his players, and if his collections are sufficient, allows the sellers to deduct their commissions, usually fifteen per cent of the gross sales, and settles with the banker for the net collections. The banker would be expected to have varying amounts of cash on hand on Saturday afternoons, depending on whether many of the pickup men report in person or by phone to the banker.

Prior to November 1, 1951, there had been no Federal tax applicable to the operation of a Cuba Bolita lottery in Florida. The Acts on which the present indictment was based, 26 U.S.C.A. §§ 2707(c), 3285 and 3287, became effective November 1, 1951. (See Note preceding 26 U.S.C.A. § 3285 I.R.C.1939). The appellant had on prior occasions admitted to at least two Internal Revenue representatives that, when there was no Federal tax applicable, that is prior to November 1, 1951, he engaged as a banker in the operation of a Cuba Bolita lottery. He told one of these agents that he had employed a fictitious name, C. W. Harris, in his lottery operations. Ray Wilson Smith, manager of A. L. Sealey Com-

pany, commercial printers in Albany, Georgia, testified that since about June 21, 1950, he had printed the various slips and forms used in the lottery, ostensibly upon the order of "C. W. Harris," that the appellant was not "one of the half a dozen people who represented themselves to be C. W. Harris," but that he did accompany one of such persons on an occasion when the gambling tax Act was being considered in Congress, and that, knowing that the printing had to do with a lottery, "I said to the two of them, I said 'What is going to happen if this gambling tax stamp goes through?', and Mr. Reynolds said, 'If it goes through I am going to retire and take a trip around the world' or words to that effect." Nevertheless, on December 30, 1952, three work orders for the kind of printing used in the lottery were given to Sealey Printing Company in the name of C. W. Harris. This was after the appellant, upon his request, had been fully informed about the tax law by the Internal Revenue agent. Long distance toll tickets, required to be kept in the regular course of its business by the Southeastern Telephone Company at Tallahassee, Florida, reveal long distance collect calls from Albany, Georgia, telephone number 1947, one of the telephone numbers of the Sealey Printing Company, to the Tallahassee telephone numbers 2–8242 and 2–2594, located in the garage office at Beechwood Farms, appellant's place of operation, on December 31, 1951, March 11, 1952, and February 17, 1953. Each ticket reflects Smith of the Sealey Printing Company to be the caller.

Appellant operated, or had operated, two legitimate businesses, and the Government's theory was that these were mere "fronts." One was a sporting goods sales business, now and for some time past in liquidation. The other was "Acme Taxi Neon Company", which showed losses some years and profits in others. Income tax returns revealed that appellant had made advances to the two businesses in excess of $100,000.00.

On Saturday, November 28, 1953, a search warrant for appellant's premises, Beechwood Farms, was issued by the County Judge of Leon County, Florida. In the search, seventeen locations for telephone communication, with four trunk lines, were found on the place, the phones being listed under the names of the two legitimate businesses, of C. W. Shelton, appellant's brother-in-law, and of Joe D. Lambert, a former business associate. Two secret compartments with concealed trap doors were found in closets, one of them empty, and the other containing slips and pieces of paper, obviously used in a Cuba lottery, with numbers marked or indicated which corresponded with the actual winning numbers on the Cuban National lottery for the Saturdays of each week from October 3 through November 21, 1953.

While the raiding officers were present in appellant's office, they answered eight incoming telephone calls; three were unrelated to the case; three consisted principally of the calling off by the caller of a series of numbers in a manner peculiar to the methods of telephonic reporting to a Cuba Bolita headquarters, one, from Miami, asked for the appellant by name, and wanted to know, "What you got for me?" and hung up when appellant could not talk in person. The officers inferred that this call was from appellant's "lay off." The remaining call was from a Mrs. W. E. Harrell, whose husband had been with the appellant when the officers arrived on the raid. Her conversation, as related by the Sheriff, is set forth in the margin.[11]

Long distance toll tickets of telephone calls both incoming and outgoing on a succession of Saturday afternoons, typical of telephonic communication in the conduct of a lottery business, were received in evidence over appellant's objection.

The evidence of the telephone conversations received by the raiding officers was competent, we think, as circumstantial evidence going to show the operation of a lottery. Beard v. United States, 65 App.D.C. 231, 82 F.2d 837, 841; Billeci v. United States, 87 U.S.App.D.C. 274, 184 F.2d 394, 397, 24 A.L.R.2d 881; United States v. Lewis, D.C.D.C., 87 F. Supp. 970, 974; Braswell v. United States, 5 Cir., 200 F.2d 597, 599; 20 Am.

11. "I answered the phone—the conversation went on and I told her 'what is it' or 'Go ahead' or something like that, and I acted as though I was very busy. She asked me, thinking that I was the boss or Winston,—

"The Court:

"You don't know what she thought, she asked you without knowing who you were?

"A. Excuse me Judge. She asked me if I knew her husband had been put in jail in Tallahassee. I told her yes but not to worry about it. She said—I can't quote this conversation verbatim—she said that she was scared to death, that she had removed the stuff out of the store and wanted to know what to do with it. I told her to get it all over to Tallahassee as quick as she could.

"Q. Had removed what out of the store?

"A. The stuff. She referred to it as the stuff, she wanted to know what to do with it. I told her to get it over to Tallahassee just as quick as she could. She said, 'Well, you meet me.' I said,

'No, you know I am just as busy as the devil,' or I used some slang or cuss word in there, 'you must know that, and get it all over here.' She said, 'How am I going to get it over there?' I said, 'I don't care, get it here any way you can, and I will have somebody meet you.' She said, 'I will be in a negro taxi and will meet you at Talquin Inn.' I said, 'No, I won't be there, but I will have a man there, he will be sitting in front of Talquin Inn, in a brown Chevrolet.' I said, 'When you come in have the taxi driver turn off the Quincey Highway onto the Blountstown Highway, and that brown Chevrolet will be sitting there in front of Talquin Inn and you have him circle around and go on out on the Blountstown highway and the brown Chevrolet will follow you.' I said, 'That car will then follow you and pick up the stuff from you there.' The conversation ended with that understanding. I went personally out there to make the contact, but there was no results to this contact."

Jur., Evidence, Sec. 457; 31 C.J.S., Evidence, § 239.[12]

The telephone toll tickets were likewise admissible as circumstantial evidence. See same authorities and, also, Duncan v. United States, 5 Cir., 197 F.2d 935; Blakeslee v. United States, 1 Cir., 32 F.2d 15, 17; United States v. Radov, 3 Cir., 44 F.2d 155, 157; Brink v. United States, 6 Cir., 60 F.2d 231, 234; Wood v. United States, 5 Cir., 84 F.2d 749, 751; Jarvis v. United States, 1 Cir., 90 F.2d 243, 245; United States v. Gallo, 2 Cir., 123 F.2d 229, 231; United States v. Novick, 2 Cir., 124 F.2d 107, 110; Dolff v. United States, 7 Cir., 61 F.2d 881, 884, certiorari denied 289 U.S. 763, 53 S.Ct. 797, 77 L.Ed. 1506.

█ Various adding machines and typewriters, a short-wave radio set, and other equipment seized in the raid, after being gathered together were photographed in one room, and the defendant objected to the introduction of that photograph after the conditions had been altered and the equipment placed, according to appellant, in posed positions. The photographer testified that there was no effort to pose or stage the photograph. The officers made it clear that the equipment had been collected from various locations for hauling away. We do not think that the jury could possibly have been misled by this photograph or that there was any error in permitting its introduction.

█ When the raid occurred, the appellant requested the officers to release two young boys working in the Taxi Neon shop, exclaiming, "I am responsible for all this—they have nothing to do with this!" Other remarks were made during the raid in which the defendant

assumed full responsibility for whatever operations were found. When the first telephone call came in, appellant undertook to warn the caller by shouting in the direction of the phone, "Police—its the police." Over $1,600.00 was found on the person of a woman employee. Further details are unnecessary to demonstrate that the evidence was ample to justify denial of the motion for judgment of acquittal. None of the errors complained of call for a reversal. The judgment is therefore

Affirmed.

---

12. The grounds of objection to the various telephone conversations did not in any way refer to the Fourth or Fifth Amendments to the Constitution nor to the "Wire Tapping Act," 47 U.S.C.A. § 605, nor are such grounds of objection urged in brief. See, however, Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314; Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298; Billeci v. United States, supra; Sullivan v. United States, D.C.Cir., 219 F.2d 760, 762. We have not, therefore, considered such grounds of objection. Rule 51 Federal Rules of Criminal Procedure; On Lee v. United States, 343 U.S. 747, 749, note 3, 72 S.Ct. 967, 96 L.Ed. 1270. See, also, cases collected in Key Numbered Federal Digest under Criminal Law, ⊶695