**UNITED STATES of America,**
**Plaintiff,**

v.

**Marvin L. KLINE, Fred Fadell, Abraham L. Koolish, David F. Koolish, John B. Carnell, Philip G. Rettig, J. George Zimmerman, Defendants.**

**No. 4-62-Cr-7.**

United States District Court
D. Minnesota,
Fourth Division.

Sept. 10, 1963.

See also D.C., 205 F.Supp. 637.

Miles W. Lord, U. S. Atty., and Hartley Nordin, Asst. U. S. Atty., Minneapolis, Minn., for plaintiff.

Harry H. Peterson, Minneapolis, Minn., for defendant Kline.

John W. Simpson, Minneapolis, Minn., for defendant Fadell.

James A. Sprowl, Albert E. Jenner, Jr., and Robert Pfaff, Chicago, Ill., for

defendants A. L. Koolish, David F. Koolish and Carnell.

C. Paul Jones, Minneapolis, Minn., for defendant Rettig.

L. H. Mikeworth, White Bear Lake, Minn., for defendant Zimmerman.

DEVITT, Chief Judge.

In this mail fraud prosecution, the defendants have moved for a new trial and for judgment of acquittal following the return of jury verdicts against them. The seven named defendants were charged in a 16-Count indictment with mail fraud and conspiracy. In the course of the trial, one of the defendants, Fred Fadell, pled guilty, and the case against another defendant, Philip G. Rettig, was severed because of his incapacitating illness during the trial. The verdicts against the remaining five defendants are detailed in the footnote.[1]

Defendant Marvin L. Kline served as Alderman and Mayor of Minneapolis. He was the first President, and later Executive Director, of the Sister Elizabeth Kenny Foundation. The Foundation is a charitable organization established by the late Sister Elizabeth Kenny, noted Australian nurse. She originated a different treatment for victims of infantile paralysis. The Foundation headquartered in Minneapolis and, during the time pertinent, operated a hospital and training facilities for nurses and doctors in the Kenny method of treatment.

Defendant A. L. Koolish now lives in Los Angeles, and his son, David F. Koolish, and John B. Carnell live in the Chicago area. The three of them have long been active in the operation of mail solicitation concerns, particularly in the solicitation of funds for charitable organizations.

Philip G. Rettig, as against whom the case was severed in midtrial, served for a time as President of one of the Chicago

mail solicitation companies operated by the Koolishes and Carnell.

Fred Fadell, who pled guilty in the course of the trial, served as a public relations director for the Kenny Foundation.

George Zimmerman was the Foundation's Auditor.

The Sister Elizabeth Kenny Foundation, established in 1943, grew into a substantial and nationally-known organization. Its solicitations for funds were conducted on a nationwide basis, but principal interest and financial support prevailed in the midwest area surrounding the State of Minnesota, the Detroit, Michigan area, and to some extent along the Eastern Seaboard. The Kenny method for the treatment of the victims of infantile paralysis, while first opposed by medical doctors, later was recognized as a very beneficial treatment procedure, and became generally accepted by the medical profession and by the public.

The alleged scheme to defraud set out in the indictment and sought to be proved by the government, was that the defendants would gain and hold possession of the list of the Kenny Foundation contributors for the benefit of the Chicago-based defendants, Koolish, Koolish, Carnell and Rettig, by means of bribery of Kenny Foundation Personnel, particularly Executive Director Kline and Public Relations Director Fadell, and would conceal from the Kenny Foundation Board of Directors and contributors the true cost of the mail fund operations, and the true identities of the operators.

The government sought to show at the trial, in part, that: the Chicago mail solicitation group secretly used the Kenny contributor list for their own benefit by selling the names for use in other charity fund drives; the Chicago defendants bribed Kline and Fadell with large secret payments each year; the cost to the Kenny Foundation in conducting these mail fund campaigns was exhorbi-

---

1. The jury found all of the remaining defendants, Kline, A. L. Koolish, David Koolish, Carnell and Zimmerman guilty of conspiracy as charged in the 16th Count of the indictment. It found Kline guilty of 9 Counts of mail fraud; A. L. Koolish, 7 Counts of mail fraud; David Koolish, 7 Counts of mail fraud; Carnell, 8 Counts of mail fraud; and Zimmerman, 1 Count of mail fraud.

tant and only a small proportion of the contributions made by the public was actually returned to the Kenny Foundation; the financial operations of the Kenny Foundation were intentionally concealed, or at least not fully and accurately reflected, in the financial statements that were made available to the public, and to governmental and community organizations concerned with policing and regulating charity fund drives.

The defense presented by the defendants was, in part, that: there was no impropriety in any of their conduct; the relationship between the operators of the mail solicitation companies and the Kenny Foundation was a regular business transaction; no money was paid to Kline and Fadell as a bribe; the lists were not improperly used or sold to other charity fund solicitation organizations; the mail fund solicitors actually rendered a beneficial and substantial service to the Kenny Foundation in that of $19,000,000 received from the mail fund campaigns, $8,000,000 of it was netted to the foundation; the Koolish fund solicitors in effect underwrote the cost of these campaigns by guaranteeing that the Kenny Foundation would incur no obligation for the conduct of campaigns which turned out to be unprofitable.

We come now to a consideration of the motions for new trial, for judgment of acquittal, and the several motions for mistrial made by the five defendants.

The motions are based on several points. The defendants Koolish, Koolish and Carnell have alleged 79 separate grounds for a new trial. Many of them are repetitious. All of the points raised in each motion have been considered. The more important ones are grouped together and afforded detailed treatment herein.

## DENIAL OF THE MOTION FOR CHANGE OF VENUE

The first of these grounds deals with the claimed failure of the defendants to receive a fair trial because they were denied a change of venue.

Prior to the commencement of the trial in March of 1963, the four Chicago-based defendants moved for a transfer of the case to the Northern District of Illinois, or to some other District, under Rule 21(a) Federal Rules of Criminal Procedure, 18 U.S.C.A., claiming that because of prejudice against the defendants in the District of Minnesota caused by adverse publicity they could not obtain a fair and impartial trial here. The defendant Kline joined in that motion.

In support of the motion the defendants presented a large number of newspaper clippings from the Minneapolis and St. Paul newspapers and offered transcripts of radio and television news stories from Minnesota stations which reflected extensive publicity involving all of these defendants in connection with the investigations of the matter by the Attorney General of Minnesota, their indictment for the federal offense by the Grand Jury in Minneapolis, the trial and conviction of Kline in the Minnesota State Court for the crime of first degree larceny, and the claimed previous violations of the law by the Chicago defendants in connection with mail solicitations for a war veterans organization, and other associated events.

The defendants' arguments for change of venue were fully considered and denied. The Court's views were expressed in a memorandum reported as United States v. Kline, 205 F.Supp. 637 (D.Minn. 1962). There the Court examined the pertinent law and especially the then recent cases of Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), and Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), and, based on the most recent expression of the Court of Appeals for the Eighth Circuit in Blumenfield v. United States, 284 F.2d 46 (1960), cert. denied, 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1961), held that the ultimate question involved in the motion for change of venue was whether it was possible to select a fair and impartial jury, and that the proper occasion for such a determination was upon the voir dire examination.

Now, following trial, the defendants urge that two recent decisions, one of the United States Supreme Court and one of the Second Circuit Court of Appeals, put a different light on the matter.

It is urged that Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) supports the defendants' position that a change of venue should have been granted in this case, and that it was prejudicially erroneous not to have done so.

A study of this case does not justify the suggested conclusion. The Rideau case involved a bank robber tried in the state court in Lake Charles, Louisiana. He was arrested the night of the commission of the crime and interviewed in his jail cell by the sheriff. The interview was recorded on film and sound track and then extensively and repeatedly broadcast so that most of the community observed or heard about the interview which, among other things, contained Rideau's confession. Very shortly after this, he was tried in the state court and convicted. Clearly it was error for the trial judge not to grant a change of venue where so many of the prospective jurors in this small, compact, cohesive community had been repeatedly exposed "in depth," close to the time of trial, to what the court calls "the spectacle" of the defendant personally confessing in detail the crimes with which he was later charged. That was quite a different fact situation from the one here, as will later be studied.

The case of United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2d Cir.), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963), reversing 204 F.Supp. 263 (S.D.N.Y.1962), is also readily distinguishable. It reached the federal court in a habeas corpus proceeding. It involved a murder charge in the state court. Here, too, knowledge of the crime was widely held by the people of the community. Of 38 prospective jurors, 36 had read about the case, and 31 had formed an opinion that the defendant was guilty. The court in Bloeth sets out in the footnotes the results of the voir dire examination of the jurors. It is manifest that the cards were stacked against the defendant when so many of the jurors had formed an opinion that the defendant was guilty.

It should be emphasized that in this case no juror was accepted who had formed an opinion as to the guilt or innocence of these defendants. The few prospective jurors who said they had an opinion as to the guilt or innocence of the defendants were not asked to state what that opinion was, but were immediately excused by the Court.

The Second Circuit in Bloeth distinguished Bloeth from Beck, supra, where all who held an opinion as to the guilt or innocence of the defendant were excused. Exactly the same was done in this case.[2]

It should also be emphasized in distinguishing this case from Rideau and Bloeth that here the trial took place some

---

2. Here is an example of the basis upon which a prospective juror was excused by the Court. Prospective juror Kenneth G. Andersen, after being asked his name, occupation, residency and other questions, was asked if he had a judgment as to the guilt or innocence of the defendants. This colloquy follows:

"A I did at one time, yes.
"Q Formulated a judgment?
"A Yes.
"Q As to whether they were guilty or innocent?
"A Yes.
"Q You say, 'I did at one time.'
"A Yes.

"Q Is that some time ago?
"A I haven't thought of it much since.
"Q I see.
"A It hasn't been in the papers very much in the last couple of years, last year or so.

"Q Was that maybe a couple of years ago that you formulated—
"A A year ago or so it was all in the paper.

"Q Did you follow it quite closely at that time?
"A No.

"Q Well, you did at one time. How are you today about it? Do you have

three years after public knowledge of the Attorney General's investigation, and two years following Marvin Kline's conviction for larceny in the state court. So that at the time the prospective jurors were interrogated in March of 1963, the great bulk of the publicity about the "Sister Kenny matter" was more than two years old and was a past event of only slight recall to the jury panel members who had any knowledge of it.

## FAIR AND IMPARTIAL JURY

Defendants' next principal ground for relief is that, because of adverse newspaper, radio and television publicity both before and during the trial, the Court erred in not permitting counsel to conduct the voir dire examination of the jurors or, in the alternative, in failing to ask all of the questions requested; in not permitting defendants additional peremptory challenges; and in not interrogating the jurors individually during the trial as to claimed adverse newspaper publicity. The gist of this argument is that defendants never did have a fair and impartial jury to start with, and that even if they did, it did not remain so because of the adverse publicity, particularly in the Minneapolis newspapers, to which the jurors might have been exposed.

It should be said in the beginning that the District Court in Minnesota has been confronted several times in recent years with the responsibility for securing a fair and impartial jury in trials involving persons and companies well known in the community. See, e. g., Isaacs v. United States, 301 F.2d 706 (8th Cir.), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed. 2d 58 (1962); Dranow v. United States, 307 F.2d 545 (8th Cir., 1962); Blumenfield v. United States, 284 F.2d 46 (8th Cir., 1960), cert. denied, 365 U.S. 812,

81 S.Ct. 693, 5 L.Ed.2d 692 (1961); United States v. Dranow, 4–61–Cr–114 (1962); United States v. Blumenfeld, 4–60–Cr–111 (1961).

So that at the outset the Court was fully appreciative of the problems involved and of the great care to be exercised in choosing, and maintaining, a fair and impartial jury and of our "heavy duty to do everything in (our) power to assure a fair trial to the defendant(s)." United States v. Accardo, 298 F.2d 133, 140 (7th Cir., 1962). Although the Court denied the defendants' motions for change of venue to Chicago for the reasons previously stated, it did state its favorable disposition to try this case elsewhere within the District of Minnesota. Experience with the trial of well-publicized persons has shown that the people of St. Paul are many times relatively unacquainted with activities, even well-publicized activities, taking place in Minneapolis. The reverse is also true. Although the "Twin Cities" are physically contiguous, communication between and activities among residents of the two cities are not extensive. In one case, that of United States v. Blumenfeld, 4–60–Cr–111 (1961), the Court at the request of the defendants moved the place of trial from Minneapolis to St. Paul. On interrogating a panel of jurors there, it was found that only one member of the entire panel had ever heard of the defendant, a criminal figure well known in Minneapolis and the subject of extensive newspaper, radio and television publicity there for some 30 years.

In the light of this experience, the Court, in picking a jury panel for the trial of these defendants, directed the Clerk, in accordance with the authority granted by 28 U.S.C.A. § 1863 (1950), to draw one-half of the jurors from St. Paul and the surrounding area, one-

---

a judgment about the guilt or innocence of the defendants?

"A Yes, I suppose.

"Q Do you think you could be a fair and impartial juror?

"A Yes.

"Q It sounds a little inconsistent, though, doesn't it?

"A It does.

"Q Do you think it is?

"A Gee, I wouldn't say.

"Q What?

"A I couldn't say.

"Q Well, you may be excused, Mr. Andersen. You may step down, and if you will go down to the clerk's office."

fourth from the rural area around the Twin Cities area and one-fourth from the City of Minneapolis, with the thought that we were more likely thereby to secure jurors unacquainted with these defendants, their activities and the charges against them.[3] Of the jurors selected to serve in this case, only 3 came from the City of Minnneapolis. Six lived in St. Paul, 2 in the suburbs or communities adjacent to St. Paul, and 1 in a suburb of Minneapolis.

## VOIR DIRE EXAMINATION

Defendants complain that they were not permitted to conduct the voir dire examination. This does not occasion ground for complaint because it is clear from Rule 24(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., that the Court has discretion to conduct the examination itself or to permit counsel to do so. It is the long-time habitual practice in this District for the Court to conduct all interrogation of the jurors in both civil and criminal cases, and to permit counsel, following the Court's interrgogation, to submit additional questions.

In this case, the Court conducted all inquiry of the jurors. The defendants complain that the Court did not ask all of the questions which the defendants submitted to the Court. Counsel for the Chicago defendants, Koolish, Koolish and Carnell, submitted a list of 79 questions. It is true that the Court did not ask each of these questions of each of the prospective jurors. For instance, the Court did not specifically ask each juror the number of children he or she had, their names, their ages, or where they went to school. But the gist of the questions submitted going to the vital factors necessary to make a determination as to the impartiality and qualifications of the jurors, was asked. The Court particularly inquired as to the prospective jurors' association or acquaintance with the operations of the Sister Elizabeth Kenny Foundation, whether he or she had contributed to it or had worked as a solicitor. Specific and careful inquiry was made to each juror as to whether he or she had ever read or heard anything about the Kenny Foundation difficulties, with the claims of fraud involving the defendants, and with Marvin Kline's prosecution in the state court. In the event that any affirmative response was made to these and similar questions, the Court conducted further inquiries in order to elicit all the pertinent facts. All who expressed an opinion as to guilt or innocence were excused.

█ It wouldn't have made much sense for the Court to have asked each of the prospective jurors each of the 79 questions submitted by the Chicago defendants. Many of them dealt with irrelevant matters. Some were not pertinent in view of answers given to previous questions, and some of them were of an argumentative nature. Of course, it is well established that the questions to be asked of jurors on their voir dire examination rests in the sound discretion of the trial Court. Yarborough v. United States, 230 F.2d 56, 63 (4th Cir.), cert. denied, 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487 (1956), affirming 16 F.R.D. 212 (D.C.1954). The Court has reread the entire voir dire examination of all the jurors, together with the submitted questions, objections, and arguments of counsel in connection therewith, and in so far as one can make an objective judgment of his own conduct, the Court is satisfied that the voir dire examination was fair, adequate and sufficiently extensive so as to form a basis for determining the impartiality of the prospective juror and to give the defendants an adequate background of the juror to permit counsel to intelligently exercise their peremptory challenges. It must always be re-

3. The Clerk's records reflect that the jurors reporting for service came from the following counties in the following numbers: Hennepin County, 20; Anoka County, 8; Ramsey County, 33; Dakota County, 4; Washington County, 6. Thus it appears that 46% came from Ramsey County (St. Paul), 11% from Anoka County, 8½% from Washington County, 5% from Dakota County, and only 20% from Hennepin County (in which Minneapolis is located).

membered that a party, even in a criminal case, is not entitled to a jury which is favorable to him, but only to one which is fair and impartial. The right to an impartial jury is one of rejection and not of selection. United States v. Marchant, 12 Wheat. 480, 481, 25 U.S. 480, 481, 6 L.Ed. 700 (1827); Philbrook v. United States, 117 F.2d 632 (8th Cir.), cert. denied, 313 U.S. 577, 61 S.Ct. 1097, 85 L.Ed. 1534 (1941).

## PEREMPTORY CHALLENGES

And in the same connection the defendants argue that they should have been allowed more than 14 peremptory challenges. Of course, under Rule 24(b), Federal Rules of Criminal Procedure, 18 U.S.C.A., the defendants were only entitled to 10 peremptory challenges. Here the Court granted them 4 additional challenges and told counsel that if after exercising the 14 challenges they could show any grounds for the request, the Court would grant them additional challenges or would, on its own, excuse any juror evidencing the slightest bias or lack of qualification.

After interrogating each of the prospective jurors and excusing those who showed any lack of qualification or the presence of a possible prejudice, and after the defendants had exercised their peremptory challenges, a colloquy took place at the bench, at which time counsel for the Chicago defendants asked the Court to grant them additional challenges. The following colloquy is reported at pages 158, et seq. of the Transcript:

"THE COURT: Well, let the record show that all counsel and all defendants are here.

"Have you exercised your strikes, gentlemen?

"MR. SPROWL: We have, Your Honor, and I should say on behalf of the defendants that there are more jurors we would challenge if we had the additional challenges. You said we could mention that. There are at least two on this list that we would challenge peremptorily if we had the challenge.

"THE COURT: Do you think that they would not be fair and impartial?

"MR. SPROWL: Well, that's our —I suppose that is always why—you don't know these things.

"THE COURT: I suppose the reason you might challenge or exercise your peremptory would be because you think one juror may be more favorable to one side than to the other, but if you have some idea that there are some jurors on that list of 32 or on the list of 8 who could not be fair and impartial, I think you ought to state it for the record, and if it is such a case, I will strike him on my own and call another juror.

"MR. SPROWL: Well, that's our feeling that we have these two other jurors that we think should not be on the jury and we—you want me to state who they are?

"THE COURT: That's up to you.

"MR. SPROWL: If they are going to be jurors I wouldn't like anyone to know it. Shall I tell you who they are?

"THE COURT: That's up to you because if you have exercised your strikes, they will soon be brought in and—

"MR. SPROWL: We have exercised all Your Honor has allowed.

"THE COURT: They will soon be brought in and sworn, and if you have objection to the jury panel I think you ought to state it in the record for your own protection.

"MR. SPROWL: Well, defendants have exhausted their peremptories and if we had additional ones we would strike jurors No. 1, Randall, and 27, Christensen. And we, the feeling is that because of the publicity in the case and so on that we have to interpret what we heard the way we think we should interpret it, the candor of the witness and so on.

Anyway our feeling is that those, we would strike if we had the challenge.

"THE COURT: I gather then your point is that from the viewpoint of your own case you would prefer to have somebody else, is that the point?

"MR. SPROWL: No. I think that is not the point.

"THE COURT: You tell me what it is then.

"MR. SPROWL: My point is that we think that they would not be fair and impartial. That's our feeling.

"THE COURT: I think you ought to state for the record, or you may think it wise to state for the record, why and in what respect and what answers to what questions prompted you to think that, if I am to make a decision on it.

"You have to point out to me where in my tentative judgment to keep these jurors is in error. It seems to me that is your duty.

"MR. SPROWL: I have to state the reason I did this?

"THE COURT: I don't think you have to, but you may think it wise to.

"MR. SPROWL: I think I would rather not state why I think so, but I do think so, and I think other defendants' counsel had agreed. We had a caucus to use these collectively. Of course, we could be very mistaken in those we struck and be mistaken all along, but that is our feeling."

It is clear from this dialogue that defendants made no showing that any of the jurors were not qualified or were not fair and impartial. If counsel had given any indication of any grounds for the action, the Court would have stricken the jurors on its own, or would have permitted additional peremptory challenges.

 Subsequent colloquy in the Transcript, starting at page 162, indicates that the attorney for one of the other defendants indicated that he felt that one of the prospective jurors on the panel was of "very low intelligence." The Court does not agree with that appraisal, but, regardless, it is not only those of high intelligence who are qualified to serve as jurors. A cross section of one's "peers" consists of people of high, low and intermediate intelligence in addition to those other human variables found in any cross section of society.

It is very uncommon in this District to conduct any hearings for cause in connection with prospective jurors, and the Court pursues a liberal policy of releasing from service any juror against whom even a plausible ground for excusing him can be stated.

 The Court in this case took the inordinate precaution of interrogating each of the prospective jurors individually out of the hearing of the other members of the jury panel so that each would be uninhibited in giving answers to questions. The Court is satisfied that each of the jurors chosen, including the 4 alternate jurors, was fully qualified and, without question, fair and impartial.

## ADVERSE PUBLICITY DURING TRIAL

Also, as a part of their claim that they did not receive a fair and impartial jury, it is claimed that the Court should have interrogated the jurors individually out of the presence of each other concerning claimed inaccurate and prejudicial publicity occurring during the trial on each occasion it was requested to do so.

In connection with this argument, it should be stated that the progress of this trial was covered by representatives of several news media. Accounts of the trial appeared almost every day, principally in the Minneapolis newspapers. Most of the claimed inaccuracies in news reporting are attributed to the Minneapolis Star stories. Even before questioning the jury panel members, the Court specifically instructed them not to read any newspaper accounts about the subject matter of the trial, not to listen to radio or observe television programs

about it, not to talk to anyone about it, not to permit anyone to talk to them about it, and not to talk about it among themselves. This first instruction and one given after the 12 jurors and 4 alternates were sworn, are set out in the footnote below.[4]

This same instruction, or one very similar to it, was repeated every day during the trial—always just prior to the evening recess, many times prior to the noon recess, and every time the Court was requested to do so by counsel. The brief of government counsel states that these admonitions were given to the jury a total of 86 times.[5]

On several occasions in the course of the trial the defendants would invite the Court's attention to newspaper publicity which they claimed was unfair and prejudicial and would request the Court to interrogate the jurors individually out of the presence of the others as to whether or not they had read or discussed such news stories. In each instance the Court interrogated the jurors as a group as to whether or not they had read or heard about such stories. In each instance the jurors responded that they had not read or heard about the news stories, and had not violated the Court's repeated admonitions. The defendants now complain that the Court should have interrogated each juror individually out of the presence of the others on each of such occasions. The Court did not make individual inquiry on each such occasion, but before submitting the case to the jury the Court did examine each juror individually out of the hearing of the other jurors and asked whether he or she had complied with and had been faithful in following the instructions and had read or heard about or observed or listened to any accounts or programs about the subject of the trial. See Transcript, p. 8708, et seq. It would have been an unduly time-consuming and

---

4. "THE COURT: I want to start out by instructing you all, those of you who have just taken this oath and those of you who have been called on the jury panel, not to read anything about this case or this matter or the people involved in it in the newspapers or to listen to any radio programs about it or to observe any television programs about it, not to talk with anybody about it and not to permit anybody to talk with you about it, and not to talk among yourselves about it.

"Now, I think you can understand better the importance of that instruction and need for you to follow it religiously if I tell you the reason for it.

"In a court of law, a person is found guilty or not guilty of a crime by a jury on the basis of the evidence that is presented in the courtroom, by documents that are presented and by the testimony of witnesses who take the stand.

" * * * [T]he point of it is that the things you hear in this room are regulated under court supervision, the things that you may properly hear that will not be prejudicial to these defendants. Of course, newspaper accounts and radio and television accounts sometimes are not always accurate and they may contain material which is not a correct reflection of what is actually going on in the courtroom. Sometimes newspaper accounts are headed by headlines which probably

are not always reflective of the true story.

"(After the 12 jurors and 4 alternates had been sworn, the Court said):

"I wish to emphasize to you all a point which you have heard me talk about two or three times already today, and I can't emphasize it too much, and that is the importance of your not talking with anybody about this case at any time that you are serving as jurors—you are permitted to go home, of course, at night—or permit anybody to talk with you about the case; that you do not read any newspaper accounts about this trial or about this whole matter; listen to any radio programs about it or observe and listen to any television programs about it.

"Now, I am afraid I'm going to have to repeat that admonition time and time again, so much so that you will maybe get tired of hearing it, but the fact that I do repeat it and will repeat it probably indicates its importance to you, importance far more reaching than you can maybe understand at this time.

"So I enjoin you to be very particular about following that admonition."

5. Compare United States v. Accardo, 298 F.2d 133 (7th Cir., 1962), where the Court refused to give cautionary instructions during the trial although requested to do so. Concurring opinion of Judge Duffy, p. 139.

unnecessary procedure for the Court on each occasion requested to separately interrogate each juror about each allegedly offensive news story published. As stated, stories were published almost daily. Good sense dictated that the Court not unduly burden the jury members with repetitive separate inquiry. As it was, the Court many times felt in repeating the same admonition day after day that it was doing so ad nauseam.

The results of the separate individual interrogation conducted before submitting the case to the jury satisfied the Court that each juror had been faithful in following the admonitions of the Court. Following such interrogation, and out of the presence of the jury, the Court said:

"The Court would like to observe from the demeanor and answers that were given to these questions by each juror that the Court is satisfied they are honest in their answers and that they have been faithful in obeying the instructions of the Court constantly given not to permit any of these outside influences to influence them in any way."

And then, addressing itself to counsel for defendants, said:

Are there any questions or observations?

There were none. Counsel started conversation about another subject. Counsel for the defendants tendered no suggestions as to the need for further inquiry or as to the need to substitute any of the 3 then remaining alternate jurors for any of the regular jurors.

■ In connection with this whole subject of claimed adverse publicity affecting the fairness of a trial, it should be recalled that factual news reporting does not of itself create a prejudicial atmosphere. Reynolds v. United States, 225 F.2d 123 (5th Cir.), cert. denied, 350 U.S. 914, 76 S.Ct. 197, 100 L.Ed. 801 (1955), reh. denied, 350 U.S. 929, 76 S.Ct. 301, 100 L.Ed. 812 (1956). It would be a practical impossibility in this modern age to conduct a trial involving persons or subjects well known in the community without the consequent publicity. And, other than locking up the jury during the whole time, the only way to conduct such a trial with reasonable certainty that the jury will be uninfluenced by publicity is by careful examination of the jurors in the first instance, and a constant repetition of the admonition to the jurors not to receive any outside information about the case, followed by inquiry to insure that the instructions are obeyed. Justice Holmes once observed that, "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day." Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), affirming 168 F. 141 (C.C.W.D. Wash.1909).

■ It is the Court's considered view that this jury was a fair and impartial one and in no way tainted by the publicity which accompanied the trial. But even assuming that the jurors disobeyed the repeated instructions of the Court, and lied when they said they had obeyed them, the fact remains that it is questionable if the news stories reflected any material which was not at one time or another brought out in the trial itself. The principal claim of the Chicago defendants was that the newspaper stories reported the allegedly unsavory conduct of the defendant A. L. Koolish in conducting questionable mail solicitation operations in the past, and that he had been indicted by a Grand Jury in Chicago. Defendant A. L. Koolish took the stand and in full detail told of his past experiences in the mail solicitation business and frankly told of his indictment by the Grand Jury in Chicago and of the subsequent dismissal of that indictment. The other principal defendant, David Koolish, likewise took the stand and fully told all about his past experiences and about the operations of the various mail solicitation companies which he and his father operated. Other witnesses gave similar testimony.

So that if a comparison were made of the alleged prejudicial publicity contained in the news media, principally the Minneapolis Star, with the evidence actually brought out on the trial, it might well appear that even if the jurors had been exposed to that publicity, it would not have been prejudicial because, within the principle expressed in Reynolds, supra, it constituted factual reporting. But the Court is satisfied that these jurors followed the admonitions of the Court and were not exposed to the newspaper publicity or any other outside influence. It is presumed that jurors will be true to their oath and conscientiously observe the instructions of the Court. Paoli v. United States, 352 U.S. 232, 242, 77 S.Ct. 294, 300, 1 L.Ed.2d 278 (1957); United States v. Sorcey, 151 F.2d 899, 903 (7th Cir., 1945), cert. denied, 327 U.S. 794, 66 S.Ct. 821, 90 L.Ed. 1021 (1946).

## ACCEPTANCE OF FADELL'S GUILTY PLEA

On the 17th day of trial, April 10, 1963, Defendant Fadell pled guilty to Count VI of the indictment.[6] The defendants urge that the Court's acceptance of the plea and its advising the jury of that fact was error, and that the Court should have granted the requested mistrial.[7]

Upon being advised by Mr. Simpson, counsel for Fadell, on April 8, 1963, that it was Fadell's intention to ask the Court for leave to withdraw his not guilty plea and to plead guilty, the Court, in chambers, conducted extensive discussion with all counsel as to the best procedure to follow in view of the contemplated change of plea. The colloquy between Court and counsel concerning this is contained in the Transcript, pp. 3068, et seq.

In accepting Fadell's guilty plea on April 10th, and in advising the jury of that fact, the Court was governed by the guidelines set out by the Eighth Circuit Court of Appeals in the case of Wood v. United States, 279 F.2d 359, 363 (1960). This case was an appeal from the United States District Court from the Northern District of Iowa, wherein Judge Graven was faced with a very similar problem. It was also a mail fraud prosecution, and several defendants were involved. Prior to the commencement of the trial some of the defendants pled guilty and in the course of the trial other defendants withdrew their not guilty pleas and entered guilty pleas. Judge Graven advised the jury members of these facts, but cautioned that such pleas should not be considered as evidence of the guilt of the remaining defendants on trial. This procedure was approved by the Court of Appeals, speaking through Judge Sanborn, when it said:

"We think the trial court did what it should have done, when it advised the jury panel that the defendants Brown and Nair had entered pleas of guilty to Count I of the indictment, and as to the effect of the pleas upon other defendants. We also approve the statement of the court to the jury with respect to the entry of pleas of guilty by Kawell, Neudeck and Barham to Count I during the trial. (Citations.) The court did not err in denying the motion for a mistrial based on the fact that the pleas of guilty to Count I by three of the defendants were entered after the trial commenced; nor did it err in not again referring to these guilty pleas, or their effect, in its final instructions to the jury."

On the basis of the Wood case, and aping the instruction therein given by Judge Graven, the Court, upon satisfying itself that Fadell was voluntarily and intelligently withdrawing his plea of not guilty

---

6. This Count was later dismissed as to the other defendants.

7. The Chicago defendants also moved that the case as to the remaining defendants be "severed" from the trial of Fadell. Since there were no other defendants as against whom the trial could proceed, it appears that this motion for severance was another expression of their motion **for a** mistrial.

and pleading guilty, advised the jury as follows:

"Members of the jury, as you observe, Mr. Fadell isn't here today, nor is his counsel, Mr. Simpson. I advise you that this morning at 9:30 Mr. Fadell moved the Court for permission to withdraw his plea of not guilty to the charges in the Indictment and to make a plea of guilty to one of the Counts in the Indictment, Count 6, and the Court, after being satisfied that he is competent to make such a plea and did it voluntarily, granted him permission, accepted his plea of guilty. So the case as to Mr. Fadell is no longer your concern.

"The matter will go on as to the other defendants. I emphasize to you the fact that Mr. Fadell has pled guilty is not to be accepted by you as evidence of the fact that these other defendants are guilty. It is not to be viewed by you as any kind of persuasive evidence or showing that the others are guilty. You may not reason or speculate that if Mr. Fadell pled guilty to one count, then the other defendants might well be guilty of that count or of other counts.

"The guilt or the innocence of each of these other defendants must be based solely upon the evidence which has been presented and will be presented in this courtroom, and upon nothing else."

*At the specific request of the defendants* the Court advised the jury as a part of its instructions following the close of testimony, as follows:

"Now, with respect to Mr. Fadell. You will recall that I advised you five or six weeks ago that Mr. Fadell had moved the Court for permission to withdraw his plea of not guilty to the charges in the Indictment and to make a plea of guilty to one of the Counts in the Indictment, Count 6, and the Court, after being satisfied that he was competent to make such

a plea and that he did it voluntarily, granted permission and accepted his plea of guilty to that Count of the Indictment and that the case as to Mr. Fadell is no longer your concern.

"I again emphasize to you the fact that Mr. Fadell pled guilty is not to be accepted or considered by you as evidence that any other defendant is guilty of anything charged against him in any Count of the Indictment or even that any crime was committed. It is not to be viewed by you as any showing or inference that any other defendant is guilty as to any Count of the Indictment.

"You may not reason or speculate that, well, since Mr. Fadell pled guilty to one Count, that it must follow that a crime must have been committed, or that some other one or more of the defendants might well be guilty of either the one Count to which Mr. Fadell pleaded guilty or of any other Count.

"The guilt or the innocence of each of the remaining defendants with respect to any one or more of the Counts of the Indictment submitted to you must be based solely upon the evidence which has been presented and upon nothing else."

In reviewing our action in accepting the plea of guilty, and advising the jury of that fact, it seems to the Court now, as it seemed then, that there was nothing else for the Court to do. Certainly, under Rule 11, Federal Rules of Criminal Procedure, 18 U.S.C.A., Fadell had the right to plead guilty. Could the Court have refused to accept his plea? I doubt it. Once the Court was satisfied that the change of plea was intelligently and voluntarily made, there was no course of action open except to receive the plea.

The only sensible thing to do then was to advise the jury of that fact. They were a group of highly intelligent persons and it would be logical, when they noted the absence of Fadell and his attorney from the courtroom, to wonder what had

happened to him and why he was not in court. The jury could not reasonably be kept in the dark. Sooner or later the fact would be apparent that he had pled guilty—the United States Attorney had stated his intention to call Fadell as a witness—and in the interest of a sensible administration of justice, the Court felt that the jury should be promptly advised of the true facts. This would avoid speculation on its part and any inferences detrimental to the remaining defendants. In fact, the course of action which the Court later pursued received the approval of Mr. Harry H. Peterson, attorney for Defendant Kline, when he suggested:

> "I should think it would be better to take the bull right by the horns and say that here is what has happened, and now you do so and so, and make it heavy in favor of the other defendants."

In subsequent colloquy in chambers the following day, Mr. Peterson indicated that in conference with all attorneys he had changed his mind about the matter.

If this Court were defending one of several defendants, charged with mail fraud and conspiracy, it would be unhappy if one of the defendants pled guilty in the course of the trial, and it would "make a record" with motions for mistrial, as these defendants have done. The discomfiture which Fadell's plea of guilty caused the other defendants and their counsel is very understandable. But it does not follow that a mistrial should have been granted, or that any prejudice resulted to the other defendants. Paraphrasing the eminent Judge Augustus Hand, "a man takes some risk in choosing his associates and if he is hailed into court with them, must ordinarily rely on the fairness and ability of the jury to separate the sheep from the goats" when one of his associates pleads guilty in the course of a trial. United States v. Fradkin, 81 F.2d 56, 59 (2d Cir., 1935), cert. denied, 297 U.S. 720, 56 S.Ct. 598, 80 L.Ed. 1005 (1936).

The basic principle of law as expressed in the Wood case, supra, which this Court followed, was based on earlier Eighth Circuit cases establishing the general principle. Holmes v. United States, 134 F.2d 125, 129–130, cert. denied, 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722 (1943); Kelling v. United States, 121 F.2d 428, 429 (8th Cir., 1941). An earlier Ninth Circuit case, Davenport v. United States, 260 F.2d 591 (1958), cert. denied 359 U.S. 909, 79 S.Ct. 585, 3 L.Ed.2d 573 (1959) expresses more exactly the principle followed by trial Judge Graven in the Wood case, and is cited as authority by Judge Sanborn in the Circuit Court decision in the Wood case at p. 363 at 279 F.2d.

The defendants in their brief make the argument that Fadell wanted to plead guilty earlier in the trial or even before trial, but that Mr. Miles Lord, the United States Attorney, would not recommend the acceptance of his plea in order that Mr. Lord could have a "spy in the enemy camp" sitting with the other co-defendants. It is urged that the prosecutor had a "call" on Fadell to bring about his guilty plea at some time most propitious to the presentation of his case, and most prejudicial to the other defendants.

This suggestion was made to the Court after Fadell's counsel advised the Court that Fadell wished to change his plea to guilty, and the Court's full inquiry into the matter is reported in the Transcript, p. 3068, et seq. Mr. Simpson, the attorney for Fadell, is an experienced lawyer who enjoys a splendid reputation for integrity and the highest professional conduct. Associated with him in the representation of Fadell was Mr. W. E. G. Watson, a long-time Minneapolis lawyer with extensive experience in the field of criminal law, who also enjoys the highest reputation. The Court placed complete confidence in the representations made to the Court by these two respected members of the Bar. Mr. Simpson fully stated the facts surrounding Fadell's change of plea, and the Court is satisfied there was no improper conduct in connection with it by any of the parties involved.

Counsel for defendants urge that they were surprised by the change of plea and had no prior knowledge of the possibility of it. But Mr. Simpson advised the Court that many months before trial he had advised the other lawyers that Fadell's course of action was uncertain and that it was not unlikely that he would change his plea. He said that the night before trial, all counsel were again advised of substantially the same facts. Counsel admitted this. So the possibility and probability of a change of plea from not guilty to guilty was well known by counsel for all of the defendants. And it was apparent during the days of trial before the change of plea was accepted that the other defendants were treating Fadell and his lawyer accordingly. Fadell was physically segregated from the other defendants, and Fadell's attorney sat conspicuously removed from the center of activity of other defense counsel.

 The Court did its best to protect the other defendants from any possible prejudice which might come to them as a result of Fadell's plea of guilty. No reference was subsequently made in the course of the trial to the fact that Fadell had pled guilty, and it was only when specifically requested to do so by counsel for the remaining defendants that the Court in its jury instructions referred to the fact that Fadell had pled guilty, and emphasized that that fact should in no way be considered by the jury in determining the guilt of the remaining defendants.

## CLAIMED MISCONDUCT OF UNITED STATES ATTORNEY

Defendants' next ground in support of their motions for judgment of acquittal or a new trial is based on the claimed misconduct of the United States Attorney in the course of the trial. Defendants claim that the prosecutor made prejudicial statements of alleged facts, and conducted cross-examination which inferred the existence of alleged incriminating circumstances, as to all of which the government offered no proof; that the prosecutor in the presence of the jury requested defense counsel to stipulate to the admission of facts and exhibits, which was prejudicial; and that the rebuttal argument of the United States Attorney was inflammatory, resulting in the return of a verdict based on passion and prejudice.

The Court has examined the several claims cited by the defendants in their motion and in their brief supporting the argument that in both direct and cross-examination the prosecution insinuated the existence of facts which were not later proved.

After some nine weeks of trial, the jury was growing tired and restless. The questions of witnesses and the evidence was becoming repetitious. The Court in chambers suggested to counsel that it might be wise from the viewpoint of both sides if they contemplated closing the testimony in the near future. All parties agreed.

This fact is recited in order to suggest that it is not unlikely that if the prosecutor were afforded the opportunity, he could have proved some or maybe many of the inferences contained in the questions asked on direct and cross-examination to which defendants' counsel make objection.

Fred Fadell did not testify. The decision of the United States Attorney not to call him—although he several times stated his intention to do so—may have been based on the many vigorous anticipatory objections by defense counsel to the calling of Fadell. But, had Fadell been called, it is not improbable that his testimony would have proved many of the inferences to which objection is made.

 But, at all events, the prosecutor had the duty as legal counsel for the government, to vigorously present his case as best he could and to bring out every facet of the evidence which would go to prove the guilt of the defendants. A rereading of the claimed prejudicial questions and inferences does not persuade that they were prejudicial. But,

to negative any improper inferences, the Court, *at the specific request of the defendants,* gave an extensive instruction directing the jury to completely disregard all the inferences and implications recited. The instruction is set out in full in the footnote below.[8]

### REQUESTS TO STIPULATE

It is also complained that counsel for the government, in the presence of the jury, requested defense counsel to stipulate to certain facts in evidence, which constituted prejudicial misconduct.

As has been pointed out, this was a long trial. But it would have been much longer were it not for the cooperative attitude of all counsel in entering into stipulations for the admission of facts and evidence, particularly including books and records of account of the several business organizations involved. Mr. Sprowl, one of the counsel for the Chicago defendants, was very cooperative in

---

8. And now I have a series of instructions in which I wish to call your attention to certain comments and statements made by the prosecutor concerning which no evidence was subsequently offered, and the purpose of this instruction is to invite your attention to those events, and to caution you and instruct you that you are to disregard any inferences that might arise from Mr. Lord's reference to these matters.

You will recall, for instance, that Mr. Lord was interrogating A. L. Koolish, and he inferred that a meeting took place in Chicago in February of '52, either the fall of '52 or sometime in '52, attended by Kline, Fadell and Koolish. Allegedly discussions took place about Kline's paying his income tax on money received by him from Fadell. The inference was that this group made a trip to Palm Springs, California, and remember there was a big eight-passenger Cadillac automobile, allegedly at that time the inference was that certain conversations took place between Mr. Koolish, Mr. Kline and Mr. Fadell concerning the Fadell payments to Kline. Mr. Koolish denied any such meetings in Chicago. He denied a recollection of a trip to Palm Springs or that any such conversations inferred by Mr. Lord took place.

You will recall also that during his examination of Philip Koolish, he was asked questions, Mr. Philip Koolish was, inferring that a meeting had taken place in Chicago attended by Mr. A. L. Koolish, Marvin Kline, Fred Fadell and D. W. Onan at which there was a discussion respecting receipt of payments by Mr. Kline from Mr. Fadell. On that occasion it was represented by Mr. Lord that such conversation took place. The witness denied the meeting and the conversation and no evidence was offered with reference to the Chicago meetings or the Palm Springs vacation meeting. Neither the statements made nor the questions put by Mr. Lord are evidence that the Chicago meeting, the Palm Springs trip, or the alleged conversations took place or that defendant A. L. Koolish had knowledge of any arrangement between or any monies paid by Fred Fadell & Associates to Mr. Kline, and so you must entirely disregard and erase those items from your mind.

In the course of his examination of Mr. Philip Koolish, Mr. Lord asked questions he inferred or in which he made a statement that A. L. Koolish told Ferguson to destroy Postmasters' letters;

That at Boston in one year over a third of hundreds of thousands of letters had to be thrown away;

That Cleveland and Cincinnati, Ohio did not have very high returns;

That the witness or one of the Chicago mail concerns gave Mr. Fadell $2,500 to make a loan to Dr. Warden.

The witness Philip Koolish denied that any of these events or conversations took place.

No evidence was offered by the Government to prove that any of these events or conversations inferred or suggested did take place.

Those questions, statements, inferences with respect to these matters are not evidence, and you must disregard them in reaching your verdict.

In the course of his examination of Mr. A. L. Koolish, Mr. Lord asked questions of the witness in which he exhibited to the witness in our presence four New Century Corporation checks, and by his questions to the witness, he inferred that the checks were payable to Mr. Fadell and covered monies paid to Mr. Fadell for ulterior purposes.

None of these checks was received in evidence. They were not identified or offered, and no testimony with respect to them was received.

They, too, are not evidence, and neither they nor any inference suggested with respect to them is to be considered by you in reaching your verdict.

this regard. Before trial, the Court held pretrial conferences in order to secure, if possible, agreement of counsel as to the admission of evidence and other matters; and almost every afternoon following trial, the Court held informal conferences in the courtroom and on the record with reference to the course of proceedings and the admission of evidence for the next day. This visualized the expedition of the trial. It was particularly effective during the presentation of the government's case. The United States Attorney was requested to advise defense counsel as to the exhibits contemplated to be offered the next day. This permitted defense counsel to determine in advance whether or not they wanted to make objection or to agree to the admission of exhibits. This resulted in doing away with many unnecessary delays in the trial which would have otherwise taken place. As previously stated, defense counsel were very cooperative in stipulating to the introduction of exhibits.

When the various grounds for claimed prejudicial request to stipulate are examined in the light of the practices above outlined, it will be seen that the colloquy originated by the United States Attorney with reference to stipulations were, in many instances, an outgrowth of the previous discussions about the reception of evidence. But none of the claimed suggestions for stipulation evidenced a purpose or desire to embarrass or take advantage of defendants or defendants' counsel or to prejudice the defendants in any way.

### REBUTTAL ARGUMENT OF UNITED STATES ATTORNEY

It is also urged that the rebuttal argument of the United States Attorney was inflammatory and resulted in a verdict based on passion and prejudice. Many grounds are cited in support of this claim, and the argument of the prosecutor is dissected and many parts of it are particularly commented upon. It is not urged that the principal jury argument, made by the Assistant United States Attorney, was prejudicial.

It must be realized that the United States Attorney, like the attorneys representing the defendants, is an advocate and "it is entirely proper for him as earnestly as he can to persuade the jury of the truth of his side, of which he ought to be thoroughly convinced before he begins at all." DiCarlo v. United States, 6 F.2d 364, 368 (2d Cir.) cert. denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925).

The Court in DiCarlo, supra, went on to say that: "To shear him of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice; * * *."

And so, "some latitude must be given to lawyers' language in a hard fought case. * * *" United States v. Kravitz, 281 F.2d 581, 586 (3rd Cir., 1960), cert. denied, 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372 (1961).

The cases uniformly hold that it is only when the claimed misconduct furnishes good reason to believe that it influenced the jury's verdict that it will be held to be prejudicial and grounds for a new trial. Marks v. United States, 260 F.2d 377, 383 (10th Cir., 1958), cert. denied, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959). Our own Eighth Circuit Court of Appeals, in its most recent expression in Isaacs v. United States, 301 F.2d 706, 736, cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962), said that:

"The dominating question, always, is whether the argument complained of was so offensive as to deprive the defendant of a fair trial."

The Court listened attentively to the rebuttal argument of the United States Attorney, and has reread it. While in many respects it is not a model type of prosecutor's argument, still when it is appraised in its entirety, and in the light of the long trial and the provocation by defense counsel for some of the prosecutor's comments, the argument was not

so awry as to have unfairly influenced the jury or deprived the defendants of a fair trial. The evidence of guilt was voluminous and persuasive, and the Court is of the view it was upon that, not the rebuttal jury argument, that the verdicts were based.

As was reasoned by the Court of Appeals in Blumenfield v. United States, 284 F.2d 46 (8th Cir., 1960), cert. denied, 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1961), the fact that the jury was so discriminating in finding guilt on some counts as to some defendants and not as to others, is persuasive that the jury reached its verdicts of guilt based only on the evidence.

As was observed by the Ninth Circuit Court of Appeals in the recent case of White v. United States, 317 F.2d 231 (1963), some of the prosecutor's "remarks had been better left 'unremarked,'" but in context we do not find them inflammatory.

Before argument to the jury, all counsel agreed (Tr. p. 8171) that objections to the remarks of counsel would not be made in the course of those arguments. This arrangement was agreed to after the Court advised counsel (Tr. 8169) of the observations of the Court of Appeals in the case of Isaacs v. United States, 301 F.2d 706 (8th Cir.), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962), that the better practice is for counsel to make their objections when the allegedly offensive argument is being made, rather than to wait for the conclusion of the argument. Mr. Lord, the prosecuting attorney, agreed to this, but said that he would have no objection to being interrupted at any time by defense counsel. But, undoubtedly prompted by gentlemanly observance of the agreement, defense counsel did not do so.

But at the very first opportunity—that is, in the jury charge—the Court instructed the jury that the arguments of counsel were not to be considered as evidence. See particularly Tr. p. 8735 where the Court said, "the argument, comments, observations, expressed beliefs and opinions of these lawyers are not evidence,

and they should not be considered as such by you." So that, conceding that some of the comments and observations the prosecuting attorney made in the rebuttal argument were not germane, it must be presumed that the jury followed the instructions of the Court.

It is the Court's opinion based on, participation in and observation of the trial, acquaintance with counsel and the jury, a consideration of the volume and kind of evidence received, the verdicts reached, and a knowledge of the relationship between the jury and counsel, that the prosecutor's rebuttal argument was not inflammatory or prejudicial, was not a basis for the jury's verdicts, and did not deprive the defendants of a fair trial. See United States v. Brennan, 137 F.Supp. 888 (D.Minn.1956), affirmed, 240 F.2d 253 (8th Cir.), cert. denied, 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 723 (1957), and cases there cited.

## CLAIMED ERROR IN ADMISSION OF EVIDENCE CONCERNING OTHER CHARITY SOLICITATIONS

The Chicago defendants complain that the Court erred in admitting evidence concerning their activities with respect to other charities. It was the government's theory that the Chicago defendants, while not the apparent, were the actual, owners of several Chicago-based mail solicitation concerns, particularly Empire Associates, Lamarge Mailing Company, and New Century Corporation. Evidence was received concerning these corporations and their conduct of business with other charitable organizations such as the National Foundation for Asthmatic Children, the Disabled American Veterans, Father Flanagan's Boys' Town and Piney Woods Country School. This evidence was received on several grounds—principally to show that similar acts of the Chicago defendants evidenced their intent and knowledge, and the absence of mistake and accident, in their modus operandi in connection with the Sister Kenny Foundation. This was proper. Moses v. Unit-

ed States, 297 F.2d 621, 624 (8th Cir., 1961); Goodman v. United States, 273 F.2d 853, 857 (8th Cir., 1960).

The evidence was also received to show the nature and extent of the participation and control by the Koolishes in the operation of Empire, Lamarge and New Century Corporations as was alleged in the indictment, paragraphs 3 and 4.

Since it was claimed by the government that the mail fraud encompassed action of the Chicago defendants in improperly renting Kenny contributor names to the other charitable foundations, the evidence was properly admissible to prove that fact. The Court cautioned the jury as to the limited purpose for which this evidence was received in the following words:

> "You will recall that evidence was received concerning the operations of mail campaigns for the D.A.V., Father Flanagan's Boys' Town, for the Tucson organization and other similar organizations.

> "Now, while there was an interrelation between the work carried on by the Chicago mailing concerns and other charitable groups, and evidence with reference to this was pertinent in connection with the extent of list rentals and other matters, the evidence was offered, and received, primarily for the limited purpose of showing the presence or absence of the required criminal intent of the defendants to carry out the claimed fraudulent scheme or plan, and to conspire to do so, as is alleged in the indictment. So you must consider this evidence only for that limited purpose. You may not consider it as having any bearing on the disposition of the defendants to commit a crime. Tr. p. 8764."

## ADMISSION OF CHARTS AND SUMMARIES

■ Complaint is also made to the admission of certain charts and summaries tendered by the government as being misleading and speculative. But substantial evidence was introduced and received as a basis for the reflections sought to be shown by the charts and summaries. This is proper. United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943); Epstein v. United States, 246 F.2d 563 (6th Cir.), cert. denied, 355 U.S. 868, 78 S.Ct. 116, 2 L.Ed.2d 74 (1957); Kampmeyer v. United States, 227 F.2d 313 (8th Cir., 1955), cert. denied, 351 U.S. 904, 76 S.Ct. 706, 100 L.Ed. 1441 (1956); Somberg v. United States, 71 F.2d 637 (7th Cir., 1934); United States v. Park Avenue Pharmacy, 56 F.2d 753 (2d Cir., 1932).

The Court gave the jury an extensive cautionary instruction with reference to these charts and summaries as follows:

> "The testimony of an accountant and any summaries or charts prepared by him and admitted in evidence are competent for the purpose of explaining facts disclosed by books, records and other documents which are in evidence. However, such charts or summaries are not in and of themselves evidence and were permitted to be used here only as a matter of convenience in understanding the evidence. So, unless you find that they are in truth summaries of facts and figures shown by the evidence, you are to disregard them entirely.

> "You will recall that counsel had some argument among themselves as to whether certain charts which were offered correctly reflected the facts which they sought to reflect. That is particularly true, I recall, of Government's Exhibit 318, which was a computation of the payments to Fadell and the alleged repayments of part of those monies to Kline between 1952 and 1956. I think all counsel or many of them brought that out in their arguments yesterday. Well, that chart, Exhibit 318, was a reflection, an interpretation in a way, of the facts as they were found by the Government's accountant. The

defense took some exception to that. You will recall that that chart sought to show that the money was being equally divided between Fadell and Kline. The defense took the position that that wasn't true; that the accountant in setting up that chart had to do a good deal of interpreting to get it to come about even. I caution you about that.

"If you find that that chart does not accurately reflect the facts, of course, discount it accordingly, or disregard it.

"Another example of the same thing was Government's Exhibit 613, which embodied the estimated contributors' names used in the fall mailings between 1952 and 1959. There, too, you might view those as only estimates or maybe interpretations of the fact, but at least the position of the Government was that that chart was an accurate reflection of what the facts actually were, although the defendants took a different position.

"So I caution you, when you are studying these charts and all of the charts, that you must make sure that they really reflect the facts. Tr. pp. 8762–64."

## SUFFICIENCY OF EVIDENCE

 The Court is satisfied that there was sufficient evidence received upon which the jury could reach the verdicts which it did. The only defendant who strongly urges otherwise is Zimmerman. While the proof as against Zimmerman was not as voluminous, as direct, or as compelling as that received as to the other defendants, there was sufficient evidence to justify the conclusion of guilt as to Counts 9 and 16 as was found by the jury, and, in fact, sufficient evidence to justify a finding of guilt as to other counts of the indictment as well. The evidence did not disclose that Zimmerman received any bribes or payments other than reasonable compensation for his professional services as a Certified Public Accountant; but there was other evidence from which the jury could well find guilt to be established. There was a substantial showing to justify the conclusion that Zimmerman falsified the audits of the Kenny Foundation, particularly as to the actual costs of the mail campaigns, and knew that the audits were intended for the public and for those charged with policing charitable drives. Zimmerman was the accountant for Kline and Fadell and knew that Kline and Fadell were receiving very substantial "payments" which came from the Chicago defendants; he did not report this or other questionable aspects of the Kenny operations of which he had knowledge, to the Board of Directors of the Kenny Foundation, albeit his professional partner, Moen, urged him to do so. After the Minnesota Attorney General started an investigation, Zimmerman changed the then current audit report to show a complete reflection of the costs of the mail operations. There was evidence that other Certified Public Accountants and accountants viewed Zimmerman's audits of the books of the Kenny Foundation as being improper.

The trial was a long one, extending from March 19, 1963 to May 29, 1963. Eighty-five witnesses testified and 803 exhibits were received. The Court Reporters said that the Record of 8,810 pages was the longest in their experience in this District.

This case was tried "to the record." Every plausible objection was made, with supporting arguments and in detail, to almost every item of evidence offered and to most courses of action attempted by the government. It is not to be inferred that counsel for any of the defendants acted improperly. Each of them was most courteous and cooperative with the Court, and conducted himself in the highest professional manner. All of the defendants were represented by competent and experienced lawyers. The attorney for Kline was a long-time Justice of the Minnesota Supreme Court and one-time Attorney General of Minnesota. Zimmer-

man's counsel possessed special competence in accountancy and the tax laws. The Chicago defendants were represented by a team of three well-known attorneys of long experience. The rights of each of these defendants was meticulously guarded at every stage of the proceedings. All defense counsel were conscientious and dedicated to their professional responsibilities. No lawyers could have represented the rights of these defendants more vigorously.

Although the defendants in their motion complain about improper instructions given to the jury, no instance of this is cited. The fact is that the Court gave every, or almost every, instruction which was requested by the defendants, and usually in the language suggested. Literally dozens of those requested by the United States Attorney were denied. The Court many times stated to the United States Attorney that if there was any question as to its rulings on a close, disputed point of evidence or procedure in the trial, the ruling would be made in favor of the defendants. (See, e. g., Tr. pp. 2105, 2106, 3557, 5695) It was.

Because this case was tried principally "to the record," the Court herein has discussed more extensively than usual the principal points which will undoubtedly be urged in the inevitable appeal that will follow. This has been done not alone to reflect the reasoning behind the action which the Court takes with reference to the motions made, but also to afford to the members of the Court of Appeals a greater insight and "feel" of the actual trial, the problems associated with it, and the reasoning behind the disposition which the trial Court made of the disputed points.

The Court is fully satisfied that each of these defendants received a fair trial from an impartial jury; that all evidence received was properly received; that no action of the trial Court was prejudicial to the defendants; and that the verdicts of guilt as expressed in the verdicts are amply supported by competent evidence.

All motions are denied.