Abraham L. KOOLISH, David F. Koolish
and John B. Carnell, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 17462.

United States Court of Appeals
Eighth Circuit.

Jan. 25, 1965.

Rehearing Denied Feb. 25, 1965.

514

Albert E. Jenner of Raymond, Mayer, Jenner & Block, Chicago, Ill., made argument for appellants and filed brief with Prentice H. Marshall and Robert E. Pfaff of Raymond, Mayer, Jenner & Block, Chicago, Ill.

Miles W. Lord, U. S. Atty., Minneapolis, Minn., made argument for appellee and filed brief with Hartley Nordin, Asst. U. S. Atty., Minneapolis, Minn.

Before VOGEL, VAN OOSTERHOUT and MEHAFFY, Circuit Judges.

VOGEL, Circuit Judge.

The appellants herein, Abraham L. Koolish, David F. Koolish and John B. Carnell, together with Marvin L. Kline, Fred Fadell, Philip G. Rettig and J. George Zimmerman, were indicted by a grand jury, charged in fifteen counts with mail fraud, 18 U.S.C.A. § 1341,[1] and a single count of conspiracy to commit mail fraud, 18 U.S.C.A. § 371.[2] During the trial Philip G. Rettig was severed from the case due to illness. He is still under indictment and his trial is pending. All other defend-

ants were found guilty by a jury of the conspiracy count and of various mail fraud counts, with the exception of Fred Fadell, who during the trial pleaded guilty to one count of mail fraud. Abraham L. Koolish and David F. Koolish were sentenced to five years' imprisonment on Counts 2, 4, 9 and 16 (the conspiracy count), and five years' imprisonment on Counts 1, 13, 14 and 15, the second sentence to be served consecutively to and not concurrently with the first sentence. Each was also fined $17,000 and ordered to pay the costs of prosecution, which totalled $7,479.76. They were found not guilty on Counts 3, 5, 11 and 12. Carnell was sentenced to a term of five years' imprisonment as a general sentence on Counts 1, 2, 4, 9, 12, 13, 14, 15 and 16, he having been found not guilty on Counts 3, 5 and 11. Kline was sentenced to serve five years' imprisonment on Counts 1, 2, 3, 4 and 9 and five years' imprisonment to be served consecutively thereto on Counts 12, 13, 14, 15 and 16. Kline was found not guilty on Counts 5 and 11. Zimmerman, who was found guilty on Counts 9 and 16 only, was sentenced to a term of imprisonment for five years but execution thereof was suspended and he was placed on probation for a period of five years. On the one count to which he pleaded guilty, Fadell was sentenced to a term of imprisonment for a period of one year and one day. Service of his sentence was stayed for 30 days, during which period he moved for further stay of commitment for two years to enable him to put his personal and business affairs in order or in the alternative to suspend execution of the sentence and place him on probation. Disposition of that motion has been continued for a period of 18 months.

Abraham L. Koolish, David F. Koolish, John B. Carnell and Marvin L. Kline appealed from the judgments of conviction. On July 27, 1964, Kline withdrew his appeal. The appellants herein, therefore, are only the two Koolishes and Carnell.

1. During the trial the government withdrew Counts 6, 7, 8 and 10, leaving but eleven counts of mail fraud.

2. Sixteen overt acts were charged as supporting the conspiracy count. Of such sixteen, overt acts Nos. 1, 3, 4, and 14 were withdrawn by the government.

## NAMED DEFENDANTS AND THE KENNY FOUNDATION

Appellants, with their co-defendants, were charged with conspiracy and with using the mails in furtherance of a scheme to defraud and obtain money and property by means of false representations from the Sister Elizabeth Kenny Foundation, its contributors and prospective contributors. The conspiracy charged was alleged to have existed over a period from January 1, 1949, to January 30, 1962, the date on which the indictment was returned. The named defendants may be described as follows:

Marvin L. Kline, former mayor of Minneapolis, Minnesota, was, during the times involved, the Executive Director of the Sister Elizabeth Kenny Foundation.

Fred Fadell, of Minneapolis, Minnesota, was the owner and operator of Fred Fadell and Associates, a public relations and advertising agency which was retained by the Kenny Foundation to perform public relations and promotional services, officing with the Foundation, rent free, and being paid by the Foundation first on a semi-monthly and later on a monthly basis.

Abraham L. Koolish, of Chicago, Illinois, was financially interested in Empire Industries, Inc., Empire Associates, New Century Corporation and LeMarge Mailing Service Company, all of which conducted direct mail solicitations for contributions for the Kenny Foundation.

David F. Koolish, also of Chicago, Illinois, is the son of Abraham L. Koolish and together with his father was financially interested in the business entities which conducted the Kenny Foundation campaigns.

John B. Carnell, of Chicago, Illinois, was an employee of the Koolish companies who handled the Kenny Foundation account.

Philip G. Rettig, of Chicago, Illinois, was president of New Century Corporation during a portion of the indictment period.

J. George Zimmerman, of Minneapolis, Minnesota, was a Certified Public Accountant who was engaged by the Kenny Foundation to perform independent audits of its books and render financial statements.

The Sister Elizabeth Kenny Foundation (variously referred to herein as "Kenny" and "Foundation") was organized in 1943. Its purpose was the treatment and rehabilitation of youngsters stricken with infantile paralysis. The Foundation had various sources of income, including the patients themselves, March of Dimes Campaign, door-to-door solicitations, gifts, bequests, grants and mail solicitations. In 1949, the Foundation turned to the two Koolishes and Carnell to assist it in raising money through direct mail solicitation. During the period from 1951 through 1960 the Koolishes, their associates and organizations, raised something more than $22,000,000 from contributors. Of that, $9,000,000 or approximately 40% of each contributor dollar reached the Foundation. The mail campaigns produced only about 25% of the Foundation's income for the period 1952 to 1959.

### THE ALLEGED SCHEME

The indictment alleged that the defendants devised a single all-inclusive scheme to obtain money by false pretenses from the Kenny Foundation and its contributors. With minor changes, the government accepts and we adopt the appellants' summary of the scheme as it was alleged in the detailed indictment. It consisted of ten material parts:

1. Kenny's Executive Director Kline and its public relations counsel Fadell awarded mail solicitation contracts to the Koolish companies (Empire Associates, Empire Industries, Inc., and New Century Corporation) without obtaining competitive bids and at rates which provided "large profits" to the Koolish companies.

2. All of the defendants (except Zimmerman) caused the fall (as opposed to spring) mailing contracts between Kenny and the Koolish companies to contain provisions for refunds by the Koolish companies in the event that the mailing costs were less than the price agreed to in

the contracts. However, this provision of the fall contracts was not fulfilled. Instead only "token refunds" were made and accepted because Kline and Fadell did not require audits to be made of the books of the Koolish companies to determine the amounts of the refunds due.

3. During the period 1952–1955 defendants A. L. Koolish, David F. Koolish, John B. Carnell and Philip G. Rettig "diverted" more than $350,000 of the proceeds realized from the mailing contracts to Kline and Fadell and concealed these facts from Kenny's directors, contributing agencies, licensing departments of states and cities, and the Kenny donors. The Koolish companies paid money to Fadell which Fadell thereafter divided with Kline. The payments to Fadell were recorded on the books of the Koolish companies as operating costs or costs of preparing Kenny's mailings.

4. Defendant A. L. Koolish purchased New Century Corporation (which participated in the Kenny mailing program) and he and his son, defendant David F. Koolish, concealed the ownership of it from Kenny, its donors and the public by appointing "dummy" directors and nominal stockholders. The two Koolishes designated Carnell and Rettig as officers of New Century and represented (a) that Carnell owned New Century and (b) that New Century was not associated with either the other Koolish companies or the two Koolishes themselves.

5. The Koolishes, Carnell and Rettig caused New Century to make gifts and to provide entertainment for Kline, Fadell and various other officers and directors of Kenny and charged the costs on New Century's books as costs of preparing mailings.

6. Kline, Fadell and Carnell arranged for Carnell to be paid $400 per month by Kenny as an administrative consultant from May 1, 1957, until March 1, 1960.

7. Kline and Fadell established a committee called the Special Events Committee which they dominated and controlled and together with Zimmerman falsely represented that this committee conducted the direct mail campaigns of Kenny.

8. Kline, Fadell and Zimmerman withheld audit statements of the Special Events Committee from Kenny directors, licensing departments of states and cities, Better Business Bureaus, contributing agencies and Kenny donors. Zimmerman prepared Kenny's consolidated audit reports which falsely stated the costs of the direct mail campaigns by reporting only a fractional part of the actual costs as "Costs of Fund Campaigns" and allocating the balance to "Costs of Therapist Training Operations; Medical Education and Training Programs; Public Education and Information Services; Promotion and Development of Additional Treatment Facilities; Grants for Medical Research; Publicity and Public Relations Operations, Provided Through National Headquarters".

9. Defendants Carnell and Rettig in the name of New Century Corporation contracted with Kline to do mailing and list maintenance for the Foundation and then caused these services to be performed by the LeMarge Mailing Service Company.

10. All of the defendants (except Zimmerman) caused the list of names of Kenny contributors to come into the possession of the Koolish companies and the Koolish companies rented these names to others and credited Kenny with only a fraction of the proceeds of the rentals, the major portion thereof being paid to the Koolish companies.

## FALSE REPRESENTATIONS

All of the defendants were alleged to have made false representations, pretenses and promises to the Foundation, the contributing agencies, the licensing departments of states and cities, donors, contributors and prospective contributors to the effect that:

1. The actual costs of the mail campaigns to Kenny were accurately and completely shown on Zimmerman's consolidated audit reports.

2. Kenny's direct mail campaigns were conducted by the Special Events Committee.

3. The Special Events Committee was an entity separate from the Kenny Foundation.

4. The Koolish companies (excepting Empire Associates and Empire Industries, Inc.) performed mailing services for Kenny at cost.

5. The Koolish companies (excepting Empire Associates and Empire Industries, Inc.) were the low bidders on the mailing services and materials for Kenny.

6. Carnell was the owner of New Century and was not associated with A. L. Koolish or David Koolish in the corporation.

7. A. L. Koolish and David Koolish held no ownership or control in New Century.

8. Carnell performed administrative consultant services for the Foundation in return for fees of $400 a month paid by the Foundation.

Each mail fraud count alleged the use of the mails for the purpose of executing the scheme and artifice to defraud.

Count 16, the conspiracy count, alleged some 16 overt acts committed by the defendants in furtherance of the conspiracy. Overt acts numbered 1, 3, 4 and 14 were withdrawn. The remainder are summarized as follows:

2. Abraham L. Koolish directed a nominee, Manuel Rosner, to purchase stock of New Century Corporation.

5. Defendant Kline authorized payments to John B. Carnell.

6. Defendants Carnell and Rettig paid approximately $630 for World Series tickets, transportation and entertainment, causing this expenditure to be entered on the books of New Century as costs of the 1957 fall mailing of the Foundation.

7. The defendant Carnell signed and sent a letter to H. M. Dean, Financial Director of the Foundation, requesting advance payment of $300,000 to New Century.

8. On or about October 20, 1958, defendants Carnell for New Century and Kline for the Foundation executed a mail campaign solicitation contract.

9. On or about March 2, 1959, Rettig for New Century and Kline for the Foundation executed a mail campaign contract.

10. On or about August 6, 1959, Fadell deposited to the account of Fred Fadell and Associates a New Century check in the amount of $3500.

11. On or about January 2, 1958, Fadell executed a personal note in the amount of $17,000 payable to New Century.

12. On or about January 11, 1955, Kline and Fadell directed that expense accounts of the Foundation employees be approved by Fadell.

13. On or about April 15, 1959, Fadell submitted a bill to the Foundation for salaries of employees of Fred Fadell and Associates for the first half of April 1959.

15. On May 25, 1959, Zimmerman wrote a letter to the Board of the Foundation transmitting a Consolidated Financial Statement.

16. On or about July 1, 1959, Zimmerman wrote a letter to the Commonwealth of Pennsylvania containing a statement to the effect that the cost of fund campaigns did not exceed 15% of the Foundation's receipts from fund campaigns for the year 1958.

\* \* \* \* \* \*

At the outset, the four defendants who lived in the Chicago area, Abraham L. Koolish, David F. Koolish, John B. Carnell and Philip G. Rettig, moved for a transfer of the case from the District of Minnesota to the Northern District of Illinois or to some other district under Rule 21(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., the basis of the motion being that the extensive newspaper, radio and television publicity concerning the affairs of the Kenny Foundation and persons connected therewith, including the defendants, had so prejudiced the residents of the District of Minnesota as to preclude a fair and impartial

trial therein. Defendant Kline joined in the motion. The other two Minnesota defendants, Fadell and Zimmerman, did not join in the motion but did not oppose it. The transfer was denied. See United States v. Kline, D.C.Minn., 1962, 205 F.Supp. 637.

The trial began March 19, 1963, concluding on May 29, 1963. Fifty-two witnesses testified in behalf of the government and thirty-three witnesses for the defendants. At the beginning of the trial the defendants challenged the panel of jurors and renewed their motion to transfer the proceedings to another district for trial. The challenge and motion were overruled.

On April 8, 1963, after approximately three weeks of trial, defendant Fred Fadell announced through his attorney that he intended to change his plea from not guilty to guilty. After the change of plea had been accepted as to Count 6, the jurors were informed of the change of plea and admonished not to consider it as evidence that a crime had been committed or that any of the other defendants were guilty. Subsequent to the convictions, the defendants made motions for a new trial which were denied by written order September 10, 1963. The trial judge's excellent and comprehensive opinion expressing his reasons therefor appears in United States v. Kline, D.C.Minn., 1963, 221 F.Supp. 776.

Appellants' first attack on the judgments of conviction is that:

THE GOVERNMENT FAILED TO PROVE A PRIMA FACIE CASE OF MAIL FRAUD OR CONSPIRACY. THE COURT SHOULD HAVE GRANTED DEFENDANTS' MOTION FOR ACQUITTAL AT THE CLOSE OF THE GOVERNMENT'S CASE.

■ In considering the record on appeal in a case where the government has prevailed, it is the duty of the appellate court to take that view of the evidence which is most favorable to supporting the jury verdict and to accept as established all reasonable inferences that tend to support the action of the jury. Taylor v. State of Mississippi, 1943, 319 U.S. 583, 585–586, 63 S.Ct. 1200, 87 L.Ed. 1600; Smith v. United States, 8 Cir., 1964, 331 F.2d 265, certiorari denied 85 S.Ct. 49 (1964); Slocum v. United States, 8 Cir., 1963, 325 F.2d 465; Thogmartin v. United States, 8 Cir., 1963, 313 F.2d 589; Koop v. United States, 8 Cir., 1961, 296 F.2d 53; Valentine v. United States, 8 Cir., 1961, 293 F.2d 708.

■ With that in mind, we have given consideration to the evidence produced by the government herein. The record before us consists of almost 9,000 pages of testimony, with many hundreds of exhibits offered by both sides. The government's case in chief—including, of course, the cross-examination of its witnesses—covers well over 5,000 pages of testimony. The case was bitterly contested and on almost all material factors there was conflicting testimony. Viewing the evidence in the light most favorable to sustaining the jury verdict and accepting the inferences reasonably to be deduced therefrom, we are satisfied that the government did prove a *prima facie* case of mail fraud and conspiracy and that there is substantial evidence to support the jury's findings thereof. A detailed discussion of the voluminous testimony and exhibits would unduly and unnecessarily extend this opinion. Among other things, however, the jury could, and undoubtedly did, find the following:

1. Unbeknownst to the directors of the Kenny Foundation, the Koolishes through Empire Industries, Inc., Empire Associates and New Century paid $359,200 to Fred Fadell and Associates during the period from February 28, 1952, through May 31, 1960. Fred Fadell, in turn, paid Marvin Kline $113,750 from December 1952 through May 1957. The inference that the other defendants knew of the division with Kline was justified through Carnell's testimony that he learned that Fadell and Associates was retaining Kline as a "consultant" and that he had so advised Phil Koolish. The close association and cooperation between the various par-

**520**

ties supports the conclusion of complete awareness of this pay-off.

2. The Koolishes, through their companies, gave many expensive gifts to and provided entertainment for Kline and Fadell and their families, and other Foundation personnel. These gifts totalled approximately $9,300 from New Century Corporation and were charged to the Foundation like any other cost of the mail campaigns. In effect, then, the payments were made and the gifts paid for out of contributions mailed to and belonging to the Foundation.

3. The inference that the payments and gifts were in actuality bribes by the Koolish companies, using Foundation money, finds substantial support in the record.

4. The Koolishes received their costs and profits before the Foundation received anything.

5. By agreement, the Koolishes or companies controlled by them were to be paid by the Foundation $20 per thousand as rental of lists of names and addresses. In addition thereto, the Foundation was to pay all other costs of mailing, including postage. Instead of using proved contributor lists or "selected names on a nationwide basis", as promised, the Koolishes used millions of names and addresses taken from telephone books which had but little value, for which they charged $20 per thousand and which resulted in waste in postage and other expenses for undeliverable mail in the fall "cold shot" mail campaigns. The Koolish companies made large profits through the use of telephone book names. P. H. Koolish testified that the $20 per thousand for names was where they made their profit. The Koolishes were fully aware of the tremendous amount of undeliverable mail resulting from the use of these names. Carnell, when informed of complaints from postmasters throughout the country and of the great amount of undeliverable mail, said that nothing could be done about it and that the letters from the postmasters should be destroyed.

6. The Koolishes had possession and control of lists of prior Foundation contributors. These were to be used in the spring campaigns. The fall "cold shot" campaigns made up of names from telephone books and other unproven sources were watched carefully and if a loss was indicated, they would be "sweetened" by using names of prior Kenny contributors. As an example, the 1959 fall "cold shot" campaign contained approximately 1,500,000 names from the Kenny prior contributors lists which were supposed to be used only in the spring campaigns. By this method the Foundation was charged $20 per thousand for the use of its own names.

7. Kline and Fadell aided the Koolishes and their companies to perpetrate fraud on the Foundation by permitting the Le-Marge Mailing Company, Inc., controlled by the Koolishes in Chicago, to have possession and control of the prior Foundation contributors lists. The Koolishes rented these names to other organizations at prices ranging from $12 to $50 per thousand without proper accounting to the Foundation.

8. There is evidence to justify the jury's conclusion that where the Koolishes purported to provide the Foundation with special donors lists, they actually used the Foundation's own prior contributor lists and in this way charged the Foundation $20 per thousand for the use of millions of the Foundation's own names and addresses between the years 1952 and 1959.

9. Because of these manipulations by the Koolishes of the Foundation's contributor lists, the Foundation in effect was guaranteeing the success of the fall "cold shot" campaigns and the Koolish companies' guarantees against loss therein became merely empty gestures.

10. Fadell and Kline allowed the Koolishes to unnecessarily convert the list of Kenny's contributor names and addresses from a manual card system to an IBM system at a substantial cost to the Foundation. The manual system previously used would have been sufficient for Foundation purposes. Fadell and Kline obligated the Foundation to pay the Koolishes excessive costs for IBM list

maintenance, whereas maintenance of a manual list used previously thereto could have been continued for a substantially lesser sum.

11. The Koolishes charged the Foundation $25 per thousand for key punching new contributor names on IBM cards, although it could have been done for $8.80 per thousand and, typewritten, the operation, as in previous years, would have cost less.

12. Homer A. Bonhiver, Certified Public Accountant, who was engaged by the Minnesota Attorney General to participate in an investigation of the affairs of the Sister Elizabeth Kenny Foundation, testified that from his examination it was determined that of $19,454,675 collected in the mail campaigns from 1952 through 1959 only $8,056,445 was received by the Foundation.

13. The Koolishes actively hid their excessively costly operation from the contributors, public agencies and Foundation directors through the use of Fadell, Kline and J. George Zimmerman, the accountant. The defendants set up certain accounting practices designed to conceal the Koolish share in the mail campaigns. These practices included the use of false consolidated financial statements made by Zimmerman to the directors of the Foundation, reporting only the net contributions and omitting all costs of the mail campaigns. They also deceptively charged part of the high cost of the mail campaigns to public education, information, medical education, grants, publicity, etc.

14. Although the directors of the Kenny Foundation were told by Kline that the mail contracts were awarded on a competitive bid basis, this was not true. The directors were also persuaded by Kline and Fadell that no one else could have done the job cheaper.

15. When news stories in the Wall Street Journal and inquiries from Better Business Bureaus caused the Koolishes and their Empire Industries, Inc., to become suspect and an investigation as to their mailing activities for Handicapped War Veterans was commenced, followed by grand jury indictment, the mailing business of the Foundation was, in the fall of 1955, turned over to New Century Corporation and it was incorrectly made to appear to the directors of the Foundation and to others that New Century had no connection with the Koolishes or with Empire.

16. There was substantial evidence to the effect that the general directors of the Foundation did not know that the Foundation was advancing funds to the Koolishes to pre-pay the costs of the mail campaigns and the directors generally had no knowledge that Fadell and Kline were receiving money from the Koolishes. The defendants connived to and actually did set up a "Special Events Committee" to pose as a front for the national mail campaigns. Through the use of this committee actual costs of conducting the mail operations were effectively hidden. The committee reported only the net contributions. Audit statements of the committee were withheld from the Kenny directors, regulatory agencies, Kenny donors, Better Business Bureaus and contributing agencies.

17. Directors who sought to question the Koolish operation and to find out about the mail costs were gotten rid of by Kline and replaced by others.

18. While the Koolishes and their companies were by contract supposed to return to the Foundation amounts saved over the estimated and agreed costs of mail campaigns, Fadell and Kline never required an accounting and the Koolishes in several instances returned only "token" amounts.

19. The Koolishes never returned to the Foundation such wholly unnecessary expenses as the bribe payments to Fadell and Kline and the gifts and entertainment furnished to them and to other Foundation personnel.

20. The 1959 fall mailing of 12,000,000 pieces could have been performed by a Minneapolis letter shop at a savings of $27.94 per thousand less than the $67.50 per thousand charged by New Century Corporation, or a total saving to the Foundation of approximately $335,304.

21. The actions of the defendants, the manner in which they worked together, the undercover things that were done, the bribes and surreptitious payments justified the jury's conclusion in finding an overall conspiracy.

Use of the mails in furtherance of the scheme to defraud was alleged in the indictment and proven in the government's case. Use of the mails has not been challenged in the appellants' brief. Appellants further have not challenged the government's proof of overt acts committed in furtherance of the conspiracy count, No. 16.

In connection with this point, the appellants rely strongly on Epstein v. United States, 6 Cir., 1949, 174 F.2d 754. Reliance thereon is entirely misplaced. In Epstein the government introduced no proof that the transactions were not entered into in good faith and in the usual course of business. Here the government has established not only excessive costs, fraudulent use of the Kenny Foundation contributors list names and charge therefor, but the surreptitious bribes to Fadell with a part thereof going to Kline. We conclude that the principles for which Epstein stands are inapplicable here, that the government did prove a *prima facie* case of mail fraud and conspiracy, and that the District Court's denial of the motion for acquittal at the close of the government's case was entirely correct.

Appellants' second contention is:

IF THERE WAS ANY PROOF OF A SCHEME OR A CONSPIRACY IT WAS OF MULTIPLE SCHEMES AND MULTIPLE CONSPIRACIES INVOLVING FEWER THAN ALL OF THE DEFENDANTS. ACCORDINGLY THERE WAS A PREJUDICIAL FATAL VARIANCE BETWEEN THE INDICTMENT AND THE PROOF.

Appellants argue that while the indictment charges all seven defendants with one grand all-inclusive scheme to defraud and alleges that the defendants participated in the one overall conspiracy, the evidence and the verdicts returned by the jury reveal that if there was any proof of a scheme or conspiracy whatsoever, it was of separate schemes and separate conspiracies involving some but fewer than all of the defendants. It is their argument that this fatal variance was prejudicial to the defendants and they cite Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, and cases following the rule of Kotteakos, such as: Canella v. United States, 9 Cir., 1946, 157 F.2d 470; Brooks v. United States, 5 Cir., 1947, 164 F.2d 142; Daily v. United States, 9 Cir., 1960, 282 F.2d 818; United States v. Russano, 2 Cir., 1958, 257 F.2d 712; Rocha v. United States, 9 Cir., 1961, 288 F.2d 545. We fail to see where Kotteakos can be of any help to the appellants herein. In that case a number of defendants were charged with a single general conspiracy to violate the National Housing Act by inducing lending institutions to make loans which would be offered to FHA for insurance on the basis of false and fraudulent information. The defendants so charged had no connection with each other excepting that all had utilized one Brown as a broker to handle the fraudulent applications. The trial judge there instructed the jury, *inter alia,* that only one conspiracy was charged and that the acts and declarations of one conspirator bound all. The court held that the rights of the defendants were thereby substantially prejudiced and ordered judgment reversed. That is entirely dissimilar to the facts with which we are here concerned.

The indictment here did indeed charge one overall conspiracy. It alleged:

"That from on or about January 1, 1949, to and including the date of the filing of this indictment [January 30, 1962], * * * the defendants herein, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises from The Foundation [Kenny] and the donors and contributors and prospective contributors to The

Foundation, as hereinafter more particularly set forth."

In furtherance of this grand scheme, the individual defendants or conspirators were charged with the performance of certain acts which contributed to their fraudulent objective; that is, to obtain money from the Kenny Foundation and its contributors through "false and fraudulent pretenses, representations and promises". They did this in many different ways, such as letting contracts to the Koolish companies without competitive bids and at rates providing large profits to the Koolish companies; making "token refunds" to the Foundation and not requiring audits of the Koolish companies' books; paying Fadell, who divided with Kline, some $350,000 and charging that amount as operating costs; concealing the true ownership of New Century Corporation, one of the Koolish companies; the making of gifts and providing entertainment to Kline, Fadell and other officers and directors of the Foundation and charging the costs thereof as costs of preparing mailings, and in other ways as set forth in the description of the alleged scheme. It was not necessary that each conspirator took part in each one of these acts. If there existed an overall conspiracy into which each defendant had knowingly entered, then if the acts of one conspirator contributed to the overall objective, each participant was guilty even though he personally had nothing to do with those particular acts. The overall conspiracy and use of the mails to defraud is charged to have covered the period from on or about January 1, 1949, to on or about January 30, 1962.

This court was recently confronted with a similar contention in Hayes v. United States, 8 Cir., 1964, 329 F.2d 209, certiorari denied Bennett v. United States, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748. Therein seven defendants, all officers or employees of a named labor organization, were charged with conspiracy to violate 29 U.S.C.A. § 501(c), which provides punishment for anyone who embezzles, steals or unlawfully abstracts or converts to his own use money, funds, securities or property of a labor organization of which he is an officer, etc. Count 1 of the indictment charged that the seven defendants conspired to unlawfully abstract money and assets from the union locals. The fraudulent transactions there were of three categories: (1) Invoice padding and kick-back arrangements; (2) fraudulent automobile repairs on non-authorized vehicles; (3) fraudulent home improvements and furnishings. Upon conviction, three of the defendants appealed, claiming *inter alia* that whereas the indictment there charged a single overall conspiracy, the proof showed only separate and distinct conspiracies. There, also, the teaching of Kotteakos was relied on by the appellants. In denying its application to the facts there which were comparable to those with which we are here involved, we relied substantially on Isaacs v. United States, 8 Cir., 1962, 301 F.2d 706, certiorari denied 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58, wherein this court, again dealing with a similar situation and reliance by the appellants on Kotteakos, said beginning at page 724:

"A fraudulent scheme and conspiracy may be and usually is established by circumstantial evidence; by inferences from the evidence of relationship of the parties and by overt acts, conduct and other probative circumstances. Marbs v. United States, 8 Cir., 250 F.2d 514, 522, 523, cert. den. sub. nom. Sarkis v. United States, 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715; Marx v. United States, 8 Cir., 86 F.2d 245, 250; Phelps v. United States, 8 Cir., 160 F.2d 858, 867, cert. den. sub nom. Peters v. United States, 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780; Madsen v. United States, 10 Cir., 165 F.2d 507, 511. 'Conspirators ordinarily do not announce that they have joined their efforts for the purpose of engaging in or furthering some unlawful scheme or plan—rather they are inclined to cover their machinations, thereby casting upon the prosecution the burden, some-

times difficult, of establishing the conspiracy, and the overt acts in consequence thereof, by circumstantial evidence,—by actions of the conspirators.' Blumenfield v. United States, 8 Cir., 284 F.2d 46, 53, 54, cert. den. 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692.

" 'Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a "development and a collocation of circumstances".' Glasser v. United States, 315 U.S. 60, at p. 80, 62 S.Ct. 457, 469, 86 L.Ed. 680; where the evidence affords satisfactory proof that a conspiracy has been formed, 'but slight evidence connecting a defendant therewith may still be substantial, and if so, sufficient.' Galatas v. United States, 8 Cir., 80 F.2d 15, 24, cert. den. 297 U.S. 711, 56 S.Ct. 574, 80 L.Ed. 998; McDonald v. United States, 8 Cir., 89 F.2d 128, 138, 139, cert. den. 301 U.S. 697, 57 S.Ct. 925, 81 L.Ed. 1352; Marx v. United States, supra, 86 F.2d 245, at p. 250. As pertinently stated by this Court in Phelps v. United States, supra, 160 F.2d 858, at p. 867: 'Once there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of whether the stick fits so natural into position in the fagot as to convince that it is part of it.' Cf. United States v. Cohen, 3 Cir., 197 F.2d 26, 29; Nye & Nissen v. United States, 9 Cir., 168 F.2d 846, 852, aff'd 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; Meyers v. United States, 6 Cir., 94 F.2d 433, cert. den. 304 U.S. 583, 58 S.Ct. 1059, 82 L.Ed. 1545.

"It is not necessary to support a finding of the existence of an overall scheme or conspiracy that each participant knew others involved therein or the precise part each was playing. Lefco v. United States, 3 Cir., 74 F.2d 66, 68, 69.

" '* * * (I)t is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity.' Blumental v. United States, 332 U.S. 539, at pp. 556, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154."

Judge Holtzhoff, in a case where Kotteakos was relied on, states the proposition clearly and succinctly in United States v. Speed, D.C.D.C., 1948, 78 F.Supp. 366 at pages 368 and 369 as follows:

"The answer to the question whether there is a single conspiracy, therefore, depends on whether there is a single agreement. There may be an undertaking to commit one crime or several crimes. If there is but one agreement, there is but one conspiracy. A test whether the activities of the defendants constitute a single conspiracy is whether there is a common purpose underlying the separate acts, whether the same objective is being pursued in each instance, and whether there is concerted action to achieve this end. It follows hence that the fact that

the conspirators undertook to commit several crimes does not necessitate the conclusion that there are several conspiracies. A conspiracy, such as is charged in this case, may be likened to a wheel, with the hub constituting the central figure, the spokes forming its various branches and ramifications, and all being held together by the rim, which represents the agreement."

In the instant case the court carefully instructed the jury:

"Proof of a conspiracy does not require an express or formal agreement, but it must be shown beyond a reasonable doubt that the members in some way came to a mutual understanding to try to accomplish a common and unlawful plan.

"Proof of membership in a conspiracy requires a showing that the alleged conspirator knowingly and wilfully participated in the unlawful plan with the intent to further some purpose of the conspiracy.

"To participate knowingly and wilfully means to participate voluntarily and understandingly in a common and unlawful plan, and with specific intent to violate the law.

"One who knowingly and wilfully joins an existing conspiracy is charged with the same responsibility as if he had been one of the instigators of it."

■ We are fully satisfied from an examination of the tremendous record here that substantial evidence supports the jury finding that there was an overall conspiracy to defraud and to obtain money and property from the Kenny Foundation and its donors, that each of the appellants cooperated with the others and each knowingly joined in the conspiracy, and that use of the mails to defraud was established in furtherance of the overall objective. It is immaterial whether or not there were minor conspiracies or schemes inside the overall conspiracy to obtain money from the Kenny Foundation and its contributors through false and fraudulent pretenses, representations and promises and that some of the defendants participated in some of these inner or smaller schemes but not in all of them.

■ The appellants argue that because some of the defendants were found guilty by the jury verdicts of some counts but not of others and that other defendants were found not guilty of some counts of which other defendants were found guilty, that the jury must have concluded that there were separate schemes. That does not necessarily follow. Here the evidence established one overall scheme to defraud the Kenny Foundation and its contributors. Following the overall agreement or scheme, each defendant participated in some but not all of the acts which furthered the objective of the conspiracy; that is, to wrongfully obtain money or property from the Kenny Foundation and its contributors. The jury could have found each conspirator guilty of each count in the mail fraud indictment. It chose not to do so and that was the jury's prerogative. Those whose activities contributed the most toward the objective of the conspiracy were, by the jury, more heavily tarred with the brush of guilt than those whose activities contributed, but to a much lesser extent. It does not follow that because Zimmerman was found guilty of mail fraud in Count 9 as well as the conspiracy Count 16, the jury, to be consistent, had to find him guilty of all mail fraud counts. The court, in sentencing him and placing him on probation after suspending the sentence, took cognizance of the fact that his participation was not major. He was a smaller wheel or spoke within the all-encompassing rim or overall conspiracy. The verdicts of the jurors merely reflect the careful consideration they gave to the status of each defendant. It should be noted that Kline was found not guilty of Counts 5 and 11, where as the two Koolishes were found not guilty of Counts 3, 5, 11 and 12. "Consistency in the verdicts is not necessary. Each count in an indictment is regarded as if it was a separate indict-

ment." Dunn v. United States, 1931, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356; Downing v. United States, 8 Cir., 1946, 157 F.2d 738. Conviction on one mail fraud count will stand even though inconsistent with acquittal on other counts. "Whether a scheme is one conspiracy or several is primarily a jury question, since it is a question of fact as to the nature of the agreement." United States v. Crosby, 2 Cir., 1961, 294 F.2d 928, 945, certiorari denied Mittleman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523, rehearing denied 369 U.S. 881, 82 S.Ct. 1138, 8 L.Ed.2d 285. We find no merit in the appellants' second contention.

Appellants' third claim of error is:

THE COURT FAILED TO SAFEGUARD THE DEFENDANTS FROM EXCESSIVE PREJUDICIAL NEWSPAPER, RADIO AND TELEVISION PUBLICITY WHICH DEPRIVED THEM OF A FAIR TRIAL.

Under this claim of error, the appellants first contend that the trial court should have transferred the case to another district for trial. Prior to the commencement of the trial, the appellants moved under Rule 21(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., for a change of venue, supporting such motion with newspaper clippings from the papers of Minneapolis and St. Paul and transcripts of radio and television news stories from Minnesota stations reflecting the publicity which this case engendered, as well as stories of the trial and conviction of defendant Kline in the state courts of Minnesota for the crime of first degree larceny in connection with his activities as Executive Director of the Kenny Foundation. The trial judge, in United States v. Kline, D.C.Minn., 1962, 205 F.Supp. 637, held, in effect, that the motion was premature. In support thereof he cited from this court Blumenfield v. United States, 8 Cir., 1960, 284 F.2d 46, certiorari denied 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692, wherein we said at page 51:

"It is clear that the mere presence of adverse publicity does not per se establish proof of prejudice, or necessarily establish that a defendant will be unable to obtain a fair trial within the district. 'The mere fact that a juror has read newspaper accounts relative to a criminal charge is not in itself sufficient grounds for excusing a juror.' Finnegan v. United States, 8 Cir., 204 F.2d 105, 110, certiorari denied 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347. The ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the *voir dire* examination."

The court thereupon denied the motion, reserving the right to the defendants to "renew their motions at the time of trial if it appears on *voir dire* that it is not possible to secure a fair and impartial jury in this District." 205 F.Supp. at p. 640.

The voir dire examination of the prospective jurors was conducted by the court. Forty-eight jurors were called and examined. Of the forty-eight, only seven expressed themselves as having some shade of opinion and they were all excused without being allowed to state such opinion. Of the sixteen regular and alternate jurors seated, none had formed an opinion of the guilt or innocence of the accused. With reference to the trial jury, the instant case can be likened to that which concerned the Supreme Court in Beck v. Washington, 1962, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98, wherein the court said at page 556 of 369 U.S., page 963 of 82 S.Ct.:

" * * * Of the 52 [prospective jurors] so examined, only eight admitted bias or a preformed opinion as to petitioner's guilt and six others suggested they might be biased or might have formed an opinion— all of whom were excused. Every juror challenged for cause by petitioner's counsel was excused; in addition petitioner was given six peremptory challenges, all of which

were exercised. Although most of the persons thus selected for the trial jury had been exposed to some of the publicity related above, each indicated that he was not biased, that he had formed no opinion as to petitioner's guilt which would require evidence to remove, and that he would enter the trial with an open mind disregarding anything he had read on the case.

"A study of the *voir dire* indicates clearly that each juror's qualifications as to impartiality far exceeded the minimum standards this Court established in its earlier cases as well as in Irvin v. Dowd, 366 U.S. 717 [81 S.Ct. 1639, 6 L.Ed.2d 751] (1961), on which petitioner depends. There we stated:

> " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' "

It should also be observed here that this trial took place approximately three years after public knowledge of the Minnesota Attorney General's investigation and two years following defendant Kline's conviction for larceny in the state court on matters arising out of his activity as Executive Director of the Foundation. The shock of the earlier exposure and the state trial could be expected to have become somewhat dissipated in the years that followed.

Appellants would draw comfort from Rideau v. State of Louisiana, 1963, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663. There is no comparability. There a motion for a change of venue from one parish to another was denied. It appeared that the parish wherein the robbery, kidnapping and murder had been committed and where the trial was held had a population of 150,000. The residents of the parish had been exposed at least three times to a televised spectacle of the defendant confessing to robbery, kidnapping and murder in an examination conducted by the sheriff and state troopers in jail without the presence of defendant's counsel. Three members of the jury, which convicted the defendant, had stated on *voir dire* that they had seen and heard the defendant's televised interview with the sheriff on at least one occasion. The court stated at page 726 of 373 U.S., page 1419 of 83 S.Ct.:

> " * * * For we hold that it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged. For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality."

We have no such situation existing in the instant case and Rideau is no support for appellants' contention. Additionally, a change of venue is generally directed to the sound discretion of the trial court. Connelly v. United States, 8 Cir., 1957, 249 F.2d 576, 584–585; Finnegan v. United States, 8 Cir., 1953, 204 F.2d 105, rehearing denied May 28, 1953; Stroud v. United States, 1919, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103. See Blumenfield v. United States, 8 Cir., 1960, 284 F.2d 46, certiorari denied 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692; Kilgore v. United States, 8 Cir., 1963, 323 F.2d 369, certiorari denied 376 U.S. 922, 84 S.Ct. 681, 11 L.Ed.2d 617; Bianchi v. United States, 8 Cir., 1955, 219 F.2d 182,

191, certiorari denied 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249, rehearing denied 349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290. We find that the trial court did not abuse its discretion in denying the motion for a change of venue herein.

The next claim under this heading is that the *voir dire* examination of the jurors was grossly inadequate. We have examined the record in detail as well as having given consideration to Judge Devitt's published opinion denying motions for new trial, United States v. Kline, D.C.Minn., 1963, 221 F.Supp. 776, 782–783. Instead of abuse of discretion as charged by these appellants, we find that the *voir dire* examination of the prospective jurors was conducted in a meticulously fair and a proper manner, that the trial judge was ever mindful of the rights and privileges of the appellants and that he sought to the very greatest degree to obtain for the trial of this case only fair, unbiased and conscientious jurors. We believe he succeeded.

The third charge under the general heading that the defendants were deprived of a fair trial is that the court failed to safeguard defendants from prejudicial publicity during the course of the trial. At the outset, Judge Devitt spoke to the prospective jurors as follows:

> "I want to start out by instructing you all, those of you who have just taken this oath and those of you who have been called on the jury panel, not to read anything about this case or this matter or the people involved in it in the newspapers or to listen to any radio programs about' it or to observe any television programs about it, not to talk with anybody about it and not to permit anybody to talk with you about it, and not to talk among yourselves about it.
>
> "Now, I think you can understand better the importance of that instruction and need for you to follow it religiously if I tell you the reason for it.

> "In a court of law, a person is found guilty or not guilty of a crime by a jury on the basis of the evidence that is presented in the court room, by documents that are presented and by the testimony of witnesses who take the stand.
>
> * * * * * *
>
> " * * * the point of it is that the things you hear in this room are regulated under court supervision, the things that you may properly hear that will not be prejudicial to these defendants. Of course, newspaper accounts and radio and television accounts sometimes are not always accurate and they may contain material which is not a correct reflection of what is actually going on in the courtroom. Sometimes newspaper accounts are headed by headlines which probably are not always reflective of the true story."

The jury was not to be confined—a matter which rests squarely within the sound discretion of the trial judge. After the twelve jurors and four alternates had been chosen and sworn, the trial judge again stated:

> "I wish to emphasize to you all a point which you have heard me talk about two or three times already today, and I can't emphasize it too much, and that is the importance of your not talking with anybody about this case at any time that you are serving as jurors—you are permitted to go home, of course, at night—or permit anybody to talk with you about the case; that you do not read any newspaper accounts about this trial or about this whole matter; listen to any radio programs about it or observe and listen to any television programs about it.
>
> "Now, I am afraid I'm going to have to repeat that admonition time and time again, so much so that you will maybe get tired of hearing it, but the fact that I do repeat it and will repeat it probably indicates its

importance to you, importance far more reaching than you can maybe understand at this time."

The record indicates that during the long trial the court admonished the jury against reading newspapers and listening to the radio and watching television broadcasts some 87 times. On the last day of the trial the court examined the jurors individually and separately as to whether or not they had complied with and had been faithful to his admonitions. Without exception each juror and alternate indicated that he had complied with the court's instructions. Thereafter Judge Devitt stated:

"The Court: The Court would like to observe from the demeanor and answers that were given to these questions by each juror that the Court is satisfied they are honest in their answers and that they have been faithful in obeying the instructions of the Court constantly given not to permit any of these outside influences to influence them in any way.

"Are there any questions or observations?

"Mr. Jenner: Your Honor pleases, in this matter about the Indictment for the jury—"

No objection was made then to the jury and the case was subsequently submitted to them for their determination. The record indicates the most scrupulous care on the part of the trial judge and also the seeming impartiality and complete honesty on the part of the jurors and alternates. We find that the appellants were not deprived of a fair trial by the publicity and that this alleged error is completely groundless.

The fourth contention of error is:

DEFENDANTS WERE GRIEVOUSLY PREJUDICED BY FADELL'S MIDTRIAL PLEA OF GUILTY. THE COURT ERRED WHEN IT PERMITTED FADELL TO CHANGE HIS PLEA, WHEN IT DENIED DEFENDANTS' SEVERAL MOTIONS MADE AT THAT TIME, AND WHEN IT INFORMED THE JURY THAT FADELL HAD PLEADED GUILTY.

On April 8, 1963, after three weeks of trial, defendant Fadell moved the court to change his plea from not guilty to guilty. After deliberation and discussion with the attorneys on both sides, the court, on April 10, 1963, out of the presence of the jury, and after ascertaining that Fadell's desire to plead guilty was voluntary and that he was competent to make it, accepted a plea of guilty to Count 6 of the indictment. Whereupon the trial court called the jury and instructed as follows:

"Members of the jury, as you observe, Mr. Fadell isn't here today, nor is his counsel, Mr. Simpson. I advise you that this morning at 9:30 Mr. Fadell moved the Court for permission to withdraw his plea of not guilty to the charges in the Indictment and to make a plea of guilty to one of the Counts in the Indictment, Count VI, and the Court, after being satisfied that he is competent to make such a plea and did it voluntarily, granted him permission, accepted his plea of guilty. So the case as to Mr. Fadell is no longer your concern.

"The matter will go on as to the other defendants. I emphasize to you the fact that Mr. Fadell has pled guilty is not to be accepted by you as evidence of the fact that these other defendants are guilty. It is not to be viewed by you as any kind of persuasive evidence or showing that the others are guilty. You may not reason or speculate that if Mr. Fadell pled guilty to one count, then the other defendants might well be guilty of that count or of other counts.

"The guilt or the innocence of each of these other defendants must be based solely upon the evidence which has been presented and will be presented in this courtroom, and upon nothing else."

Thereafter the court, in the presence of the jury, stated that "the motions which counsel made in chambers" the day before would be considered as having been repeated in open court and that they were denied. After some discussion with reference thereto, the court again admonished the jury as follows:

"Members of the jury, I meant to say right after I told you about this happening this morning, that I hope you will be particularly careful about these admonitions now, because I suppose there will be matter in the newspapers telling about this, and on the radio and television. While I suppose it may be a practical impossibility for you to avoid seeing a headline or maybe catching a glimpse of something on television or the radio, I hope you will be persistent in following the rule in not being attentive or listening to those things.

"As I have said to you so many times, it's of great importance, and later on, at some future time, I will explain in greater detail why it is. I hope you will persist in your admirable obedience to these admonitions."

At the specific request of the remaining defendants, the court in its general instructions at the close of the case, repeated the admonition as to Fadell's plea. It is the contention of appellants that "while purporting to be an active defendant, he [Fadell] was, in fact, a spy in the defendants' camp. Thus, the United States Attorney admitted that, subsequent to the indictment he and members of his staff had many conferences with Fadell and Fadell had delivered to him documents, records and other evidence." They insist that the United States Attorney had a "call" on Fadell under which he could and did select the time most propitious to his case and most prejudicial to the defendants for the announcement of Fadell's plea. The trial court handled the matter in a manner approved by this court in Wood v. United States, 8 Cir., 1960, 279 F.2d

359, where much the same thing occurred. In that case three of the defendants, after the trial had commenced, withdrew their pleas of not guilty and entered pleas of guilty, this being outside the presence of the jury. Thereafter the court advised the jurors of what had occurred and admonished them in much the same manner as Judge Devitt has done in the instant case. The late Judge John Sanborn, speaking for this court, said at page 363:

"We think the trial court did what it should have done, when it advised the jury panel that the defendants Brown and Nair had entered pleas of guilty to Count I of the indictment, and as to the effect of the pleas upon other defendants. We also approve the statement of the court to the jury with respect to the entry of pleas of guilty by Kawell, Neudeck and Barham to Count I during the trial. See, in this connection: Davenport v. United States, 9 Cir., 260 F.2d 591, 596; Holmes v. United States, 8 Cir., 134 F.2d 125, 129–130; Kelling v. United States, 8 Cir., 121 F.2d 428, 429. The court did not err in denying the motion for a mistrial based on the fact that the pleas of guilty to Count I by three of the defendants were entered after the trial commenced; nor did it err in not again referring to these guilty pleas, or their effect, in its final instructions to the jury."

In United States v. Crosby, 2 Cir., 1961, 294 F.2d 928, the Court of Appeals for the Second Circuit was confronted with a similar problem. Therein that court stated at page 948:

"It was not error to refuse to grant a mistrial when McCarthy pleaded guilty. Certainly the guilty plea cannot be used as evidence against the remaining defendants, Babb v. United States, 5 Cir., 1955, 218 F.2d 538; United States v. Hall, 2 Cir., 1950, 178 F.2d 853; United States v. Toner, 3 Cir., 1949, 173 F.2d 140; but see Grunberg v.

United States, 1 Cir., 1906, 145 F. 81, 86. But the federal courts have uniformly held it [is] not error, if proper cautionary instructions are given, for the jury to be informed during trial that one or more defendants have pleaded guilty, or even for the jury to be present when the pleas are entered. Wood v. United States, 8 Cir., 1960, 279 F.2d 359; Davenport v. United States, 9 Cir., 1958, 260 F.2d 591; Richards v. United States, 10 Cir., 1951, 193 F. 2d 554; Schliefer v. United States, 3 Cir., 1923, 288 F. 368.''

United States v. Aronson, 2 Cir., 1963, 319 F.2d 48, involved multiple charges of mail fraud as well as conspiracy. During trial three defendants withdrew their pleas of not guilty and entered pleas of guilty. The jury was informed and also admonished properly. Citing United States v. Crosby, supra, and other cases, the court stated at page 52:

" * * * no error can be attributed to the trial court's informing the jury of the guilty plea. Its instructions to the jury conformed both adequately and accurately with the instructions approved by appellate courts in similar situations. The trial court adhered to proper practice in cautioning the jury by saying, 'Let me point out that the fact that the Kimballs pleaded guilty is no proof whatsoever of the guilt of the two defendants who are on trial and that must be put out of your mind in determining the guilt or innocence of these two defendants, the Aronsons.' "

As to the charge that Fadell in effect was "a spy in the defendants' camp" and that the United States Attorney had a "call" on him, the trial court, after careful inquiry, found that counsel for Fadell had advised the other attorneys representing the co-defendants months before the trial that Fadell's course of action was uncertain and that it was not unlikely that he would change his plea; that the night before the trial started all counsel were again advised of substantially the same facts, so that the possibility of Fadell's changing his plea from not guilty to guilty was something of which his co-defendants and their counsel were apprised. The trial judge's statement with reference to Fadell's change of plea as found beginning at page 787 of 221 F.Supp. indicates the care and caution he used in making inquiry and becoming informed of all matters surrounding Fadell's change of plea. We think he could have done no more to see that the appellants received a fair trial before an open-minded and conscientious jury.

Appellants attempt to make something of the fact that the United States Attorney indicated that Fadell would be called as a witness if the court accepted his guilty plea and that he was not so called. The point has no substance, particularly when the record indicates that several times following the acceptance of Fadell's plea of guilty or his indication that he intended to plead guilty, appellants' counsel repeatedly made threats to move for a mistrial in the event Fadell was called. We find no significance in the matter and no prejudice to the appellants.

Appellants' fifth claim of error is:

THE MISCONDUCT OF THE UNITED STATES ATTORNEY THROUGHOUT THE TRIAL DEPRIVED DEFENDANTS OF A FAIR TRIAL.

Under this general heading it is first insisted by the appellants that:

"Many times during the trial various witnesses, particularly defendants or their employees, were asked questions in which the United States Attorney insinuated in detail that certain conspiratorial meetings had been held, that prejudicial and incriminating admissions had been made by various defendants or conversations had been had by or with them or in their presence, and that incriminating acts had been committed.

"In each instance the witness denied the accusation and insinuation. The United States Attorney did not thereafter offer any testimony or evidence to prove any of the alleged facts so carefully and prejudicially staged and insinuated."

A consideration of the transcript may well indicate overzealousness on the part of the United States Attorney but if it does and if it amounted to misconduct on his part, we think that it was well taken care of by the experienced and able trial judge who, at the specific request of the defendants, instructed the jury, *inter alia*:

"And now I have a series of instructions in which I wish to call your attention to certain comments and statements made by the prosecutor concerning which no evidence was subsequently offered, and the purpose of this instruction is to invite your attention to those events, and to caution you and instruct you that you are to disregard any inferences that might arise from Mr. Lord's reference to these matters.

"You will recall, for instance, that Mr. Lord was interrogating A. L. Koolish, and he inferred that a meeting took place in Chicago in February of '52, either the fall of '52 or sometime in '52, attended by Kline, Fadell and Koolish. Allegedly discussions took place about Kline's paying his income tax on money received by him from Fadell. The inference was that this group made a trip to Palm Springs, California, and remember there was a big eight-passenger Cadillac automobile, allegedly at that time the inference was that certain conversations took place between Mr. Koolish, Mr. Kline and Mr. Fadell concerning the Fadell payments to Kline. Mr. Koolish denied any such meetings in Chicago. He denied a recollection of a trip to Palm Springs or that any such conversations inferred by Mr. Lord took place."

The court thereupon carefully pointed out the names of other witnesses who had been asked questions, who had denied making the statements contained in the questions or doing the things referred to therein, and that the government had offered no evidence thereafter to establish that the events or conversations actually did take place. The court then continued:

"Those questions, statements, inferences with respect to these matters are not evidence, and you must disregard them in reaching your verdict.

"In the course of his examination of Mr. A. L. Koolish, Mr. Lord asked questions of the witness in which he exhibited to the witness in our presence four New Century Corporation checks, and by his questions to the witness, he inferred that the checks were payable to Mr. Fadell and covered monies paid to Mr. Fadell for ulterior purposes.

"None of these checks was received in evidence. They were not identified or offered, and no testimony with respect to them was received.[3]

"They, too, are not evidence, and neither they nor any inference suggested with respect to them is to be considered by you in reaching your verdict.

"You will recall that when Mr. Lord was examining Mr. David Koolish, he put questions to him in which he inferred that Mrs. Duerr told Mr. Koolish that one one-half million Kenny Foundation contributor list names had been used in the Fall mass mailings in '56, '57 and '58. Mr. David Koolish denied any such conversation had ever

---

3. As an indication of the care with which the jurors followed the court's instructions, it should be noted that they found all defendants not guilty of Count 11 which apparently involved one of the checks referred to by the court.

taken place. He denied that the Kenny Foundation contributor list names had been used in any of those years.

"These questions of Mr. Lord and the inferences inherent in them must be disregarded by you in reaching your verdict."

It is also charged that the United States Attorney's rebuttal argument was prejudicial. We have examined the record with reference to the claimed improprieties on the part of the United States Attorney, not only in his questions but in his requests for stipulations made in front of the jury and in his rebuttal argument and are convinced that the presiding judge had the entire matter well in hand and that whenever he found it necessary to admonish counsel or to instruct the jury, he did so and that he achieved the elimination of any possible prejudice thereby. See Judge Devitt's treatment of the questions beginning at page 790 of 221 F.Supp. Other claims of misconduct or impropriety on the part of the United States Attorney have been given consideration and found not to be substantiated by the record.

 Appellants' sixth and last claim of error is:

### THE COURT ERRED IN THE ADMISSION OF EVIDENCE.

The court admitted testimony of the Koolish companies' business dealings with other charitable organizations such as The National Foundation for Asthmatic Children, Disabled American Veterans, Father Flanagan's Boys Town, and Pine Ridge Country School. This was objected to as irrelevant and immaterial to the issues in this case and that it would prejudice the defendants. The testimony was admitted on the theory that similar acts of the appellants indicated their intent, knowledge and the absence of any mistake or accident in their method of operating their solicitations for charitable organizations, and the court gave full and accurate instructions to the jurors thereon. We think

the admissions were entirely proper and that no error was committed. Kansas City Star Co. v. United States, 8 Cir., 1957, 240 F.2d 643, 650, certiorari denied 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed. 2d 1438; Goodman v. United States, 8 Cir., 1960, 273 F.2d 853, 857; Moses v. United States, 8 Cir., 1961, 297 F.2d 621, 624.

 Under this heading it is also claimed that certain government charts and summaries were misleading, speculative and erroneously admitted into evidence over objection. The charts and summaries referred to were based upon substantial evidence introduced by the government through its own witnesses or in cross-examination of the defendants' witnesses. All were subject to cross-examination or re-examination by defendants' counsel. The jury was very carefully and fully instructed as to their use. We find no error in their receipt. The admission of charts and summaries is a matter which rests largely within the sound discretion of the trial court and its action in receiving the disputed charts and summaries may not be reversed by an appellate court unless such discretion be abused. Franano v. United States, 8 Cir., 1960, 277 F.2d 511, 515, certiorari denied 364 U.S. 828, 81 S.Ct. 68, 5 L.Ed.2d 57, rehearing denied 364 U.S. 906, 81 S.Ct. 231, 5 L.Ed.2d 199; Blackwell v. United States, 8 Cir., 1957, 244 F.2d 423, 429, certiorari denied 355 U.S. 838, 78 S.Ct. 49, 2 L.Ed.2d 51; Kampmeyer v. United States, 8 Cir., 1955, 227 F.2d 313, certiorari denied 351 U.S. 904, 76 S.Ct. 706, 100 L.Ed. 1441; Leeby v. United States, 8 Cir., 1951, 192 F.2d 331; Gariepy v. United States, 6 Cir., 1951, 189 F.2d 459, 462.

This long and hard-fought case extended over a period of more than ten weeks. It presented a number of difficult questions for counsel and for the presiding judge. We have examined each claimed error and are convinced, however, that there was no prejudice to the appellants through any of the trial rulings, that the case was tried with

exemplary care by Judge Devitt, that appellants all had a fair trial, and that no grounds for reversal or retrial exist.

Affirmed.